WILLIAM G. TOBEY *vs.* JOHN J. McALLISTER, DAVID
          ROSIER, et al., Appellants.

          APPEAL FROM CIRCUIT COURT, COLUMBIA COUNTY.

Heard August 11.]                         [Decided November 9, 1859.

          *Vendor and Vendee—Lien—Mortgage—Frauds.*

The vendor of real estate has a lien, under certain circumstances, on the
    estate sold for the purchase money. This equitable right is founded on the
    moral principle that a person who gets possession of property ought not to
    keep the same, without paying full consideration.
Where a party sold land and received a part of the consideration money, and
    was induced to accept notes and mortgages for the balance, which were
    worthless, and which the purchaser knew to be so at the time of sale; held
    that this conduct of the purchaser was a fraud on the vendor, and he had a
    lien on the land for the purchase money.
The receipt of a part of the purchase money was not a waiver of the lien for
    the balance.
The vendor of land having a lien for the purchase money does not lose his
    lien by taking other securities, if such securities are worthless, and known
    to be so by the purchaser, who fraudulently represented them to be good.
One fraud does not relieve a party from the consequences of another before
    practiced by him.
The case of *Weed, et al., vs. Page,* 7 Wis., 505, examined and explained.

   This action was brought in the circuit court for Columbia
county; and as it was determined upon the complaint and
demurrer, the complaint sets forth all the facts of the case.
Tobey, the plaintiff, filed his complaint in February, 1858,
and stated to the effect: That on the second of April, 1857,
Tobey was the owner of 151 acres of land in Columbia
county, on which there were large and valuable improve-
ments, and on which he resided with his family, and occu-
pied it as a farm. McAllister and Rosier had before then
been engaged in the business of driving sheep into the country
and selling them to the farmers of Columbia county. Tobey
had bought some sheep of them and owed them upon a prom-
issory note for the purchase money, $750. McAllister and

Rosier resided in the State of New York, but when travelling on their business, in the neighborhood of the plaintiff, they stopped with Tobey, and so won his confidence. He had been offering his farm for sale; and that fact was known to McAllister, who frequently conversed with him about it. He had offered to sell it to them for $3,000, which was a fair and reasonable price for it; and he agreed to take his own notes for part of the consideration; and for the balance they were to give him ample and sufficient, real estate security, that they would turn out notes secured by mortgages, which they held against other persons, as they did not wish to encumber the farm. During the negotiations McAllister represented they had four promissory notes, which he showed to Tobey, made by one Pruden to Rosier and Brown, or bearer, amounting to $1,955. McAllister represented that Pruden was a man of large property, and a farmer, residing in Loweville, in Columbia county, 22 miles from Tobey's house, and a stranger to him; also, that the notes were secured by a mortgage on real estate. He also showed such a mortgage. He also showed a chattel mortgage, made to McAllister and Rosier, on 107 sheep, merino ewes, and one merino buck, which he had purchased of McAllister and Rosier; and also on the increase of the sheep, and their wool. The ewes were represented to be full blooded Spanish, and the buck full blooded French merino; and the lands were free and clear from all incumbrances, except a mortgage of $600 or $700 given by Pruden to his father, and which was never to be enforced, and they were of the value of several thousand dollars. Tobey had no means of knowing the facts; but from the representations, he recognized a farm he had seen, situated about 22 miles from his residence. To Tobey's inquiry, how McAllister knew the lands were free, &c., he answered: "You are not afraid of my word, are you? I have just been and examined the records, and know there is nothing else against it. You have known me some time, and know, as good friends as we have always been, I would not deceive you."

McAllister also showed two notes against one Titus, payable to McAllister and Rosier, or bearer, amounting to $262 33, and one note against Grant for fifty-three dollars. They were farmers in Marquette county, and the notes were given for sheep. He said he had just seen them, and they had promised to pay the notes promptly when due. He also showed a note from one Day for $75; whom he had just

Tobey vs. McAlister et al.

seen, and he was "as good as the bank," and the note would be promptly paid. These notes were all given for the purchase of sheep. Tobey insisted on the payment of $700 or $800 down, or within a short time; and McAllister represented that he had not then the money, but the first note due from Pruden in July would be paid when he wanted to use it, as also the notes of Titus, Grant and Day, as they were all prompt and good men.

Tobey relying on the representations of McAllister, sold the farm to him and Rosier, for the sum of $3,100; after deducting his own note of $750, he received the balance of the purchase money in the notes and mortgages; and he and his wife deeded the land to them, and took the notes and mortgages.

The representations of McAllister were false and fraudulent. The lands described in the Pruden mortgage, were not free and clear from all incumbrances, except the mortgage to his father; but there were on said lands, a mortgage by Pruden to Peter Pruden for $1,420, another by Pruden to P. L. Carman for $1,200, and another by Pruden to Lay for $4,300, all on interest. All these mortgages were unpaid, and had precedence of the Rosier and Brown mortgage, which had been sold to Tobey. The mortgage to Lay had been since foreclosed, and a decree rendered to sell the land to satisfy the mortgages, which amounted to more than the value of the lands. Pruden was not a man of large property, but was insolvent; and McAllister knew it at the time. The ewes were not full blooded Spanish merinos, and of the value of $15 a head, but they were common sheep; and had been sold by Tobey for all they were worth at $2 per head; and the buck was not of the value of $300, but he had been sold for $15, which was a fair value. Titus, Grant and Day were not rich and able farmers, as good as the bank, but were irresponsible, and had no property out of which an execution against either of them could be collected. All these notes remained unpaid, and were of no value; and McAllister knew that his representations concerning them were false, and made with intent to cheat and defraud Tobey.

Tobey having ascertained the falsity of the representation, employed an attorney to look after the matters, who went on his behalf to McAllister and charged him with the frauds; and he agreed to give him further securities, and allowed him to remain in possession of the farm, until he could real-

ize from it and the securities already turned out, and from the additional ones, his full pay for the farm. He then gave to his attorney four notes, two against Cripps for $100 and $150; another against Green for $130; another against Earle for $312; all of which he represented were against good men, and would be paid when due. Nothing had been paid on these notes; and upon inquiry, Tobey had learned that the payees were at the time insolvent, and McAllister knew it, at the time he passed the notes over to him as further security. Tobey's attorney had obtained another chattel mortgage from Pruden on other property, in lieu of the wool about to be cut from the sheep, and Pruden had paid $100 on his note; and Tobey had taken possession of the ewes and buck under the chattel mortgage to McAllister and Rosier, and the one to Tobey, and sold the property for $525, which was a fair value of the property. His expenses had been $100; and he had credited on the note $425.

The $100 paid by Purden, the $425 realized on the chattel mortgage, and the $750 note of Tobey, were all the money which Tobey had received for the sale of the farm. Rosier and McAllister had no personal property in the state, and the securities were useless and worthless. Therefore he claimed a lien on the farm for the balance of the purchase money, and interest.

On the 9th of May, 1857, Rosier had executed a mortgage to Sylvanus Haynes, upon the farm, for $700. On the 21st of November, 1857, Rosier executed a deed to Elisha Lathrop, which was never delivered, and no right claimed under it; but on the 8th of February Rosier executed a deed of the farm to Warrick Price; and Lathrop also quitclaimed to Price at the same time. Haynes and Price had knowledge of the equitable lien of Tobey for his purchase money. The complaint closed with a prayer for foreclosure, &c.

To this complaint the defendants McAllister and Rosier demurred generally; which demurrer was overruled, and they appealed to this court.

*Hooker & Weeks,* for the appellants.

*Alvah Stewart and B. S. Doty,* for the respondent.

*By the Court,* COLE, J. In several cases decided by this court, but which perhaps have not found their way into the

Tobey vs. McAlister et al.

reports, we have held that a vendor of real estate has a lien, under certain circumstances, on the estate sold, for the purchase money.

The principle upon which courts of equity have proceeded in establishing this lien is that a person who has gotten the estate of another, ought not, in conscience, as between them, to be allowed to keep it, and not pay the full consideration money. 2 Story's Eq. Jur., § 1219. This doctrine is founded in natural justice and equity, and although the lien is not enforced in all the states of the Union, yet it is in most of them, as well as the courts of England. See *Macreath vs. Symmons,* 15 Ves., 329, and cases cited by Lord Eldon in his opinion in that case. 4 Kent's Com., Lecture 58, page 155, (8th Ed.); 2 Story's Eq. Jur., § 1217, *et seq.,* and notes.

Assuming then that in this state, the courts should recognize and enforce the vendor's lien, under certain circumstances, and we have to inquire whether it appears from the allegations in the complaint that, the respondent has lost or waived his right to insist upon it in this case. If he has not, the demurrer to the complaint was properly overruled.

It is contended by the counsel for the appellants, that it clearly appears, from the statements in the complaint, that by an express agreement between the parties at the time of sale, the respondent relinquished and abandoned his right to insist upon a vendor's lien, having received a portion of the purchase money by the cancellation of his own note, and taking in payment for the remainder of the purchase money, notes and mortgages given by third parties. The complaint sets forth, with great fullness and particularity, the circumstances under which the sale was made, but its allegations upon that point are too long to be quoted. It apears, however, from the complaint that the respondent sold his land to Rosier and McAllister for thirty-one hundred dollars; that a promissory note which he had given them. for over seven hundred dol-

lars was delivered up and cancelled as a part consideration for the bond; and that for the balance McAllister, who made the purchase for himself and Rosier, turned out certain notes and mortgages given by third parties, falsely and fraudulently representing them to be good, when in fact they were almost worthless. Now, conceding that the complaint shows that the parties agreed, at the time of sale that these securities should be taken by the respondent in full discharge of the consideration money unpaid, still it is very apparent that the fraud and imposition practiced upon the respondent, by McAllister, were so gross and outrageous as to vitiate this contract. For in every view, McAllister's turning over those notes and mortgages, representing them to be good, when he knew them to be worthless, was a fraud of the grossest character, and would vitiate any bargain. This is too obvious to need argument or comment.

But it was further insisted by the counsel for the appellant, that the respondent lost his right to a lien upon the land; because, after discovering the fraud which had been practiced upon him, he affirmed the contract by receiving other securities. It appears from the complaint that the sale was made in April, 1859, and that in June following the respondent having became acquainted with the fraud practiced upon him by McAllister, employed an attorney to look after the matter. This attorney went to McAllister and charged him with the fraud, and then McAllister turned out other securities, representing them to be against good and responsible persons, who were abundantly able to pay them, &c., and verbally agreed that the respondent might remain in possession of the premises until he could realize from the use of them, and from those securities, the purchase money of the farm. These additional securities proved to be worthless likewise, and the complaint alleges they were known to be so by McAllister when he turned them out.

Now it is evident that the question as to how far the taking of distinct and independent securities for the purchase money can effect the vendor's right to his lien cannot arise upon the demurrer to this complaint. For if we were of the opinion that the respondent, by taking such securities, and trusting to the responsibility of third persons, thereby lost the implied lien upon the property which the law would otherwise have given him, (*Naim vs. Prowse,* 6 Ves., 752; *Cole vs. Scott,* 2 Wash. R., 141; *Gilman vs. Brown,* 1 Mason, 191), yet that certainly cannot be the case if there was fraud in the transaction.

And according to the allegations in the complaint, McAllister not only perpetrated a gross fraud when he turned out the notes and mortgages in the first instance, representing them to be good, when he knew them to be worthless, but he made equally false and fraudulent statements as to the value of the additional securities delivered over to the attorney. If McAllister knew these latter securities were worthless, when he represented them to be good and against parties abundantly able to pay them; and if the respondent relied upon these false statements and had a right to rely upon them, when he received such securities; then we cannot very well understand how McAllister and Rosier can possibly be in a better position, or the respondent in a worse one, on account of the second fraud. It would really be a strange principle of equity and justice which would enable a party to escape or avoid the consequences of one fraud by perpetrating another upon the injured party. We know of no such doctrine in the law or in morals, and we therefore do not think that the respondent, by taking the securities turned out in June, should be deemed to have waived his lien.

It was suggested that the respondent, by retaining that portion of the consideration money received, while he proceeds to confine his right to a vendor's lien for the remainder, was

seeking to affirm a contract in part, and disaffirm it in part, which it was insisted he could not do; and in support of this position we were referred to the case of *Weed, et al., vs. Page, impleaded, &c.,* decided at the last term of this court, 7 Wis., 503, and other cases to the same effect cited upon the brief of the counsel for the appellant. We do not think the principle of those cases is in conflict with anything decided in the one under consideration.

In those cases a party sought to rescind a contract on the ground of fraud and recover the property sold, without restoring, or offering to restore, what he had received upon the sale; in the present case, the respondent by proceeding to enforce his lien affirms the original contract. All he asks is the consideration agreed to be paid for the land. He is willing the appellants should keep the land, if they will only pay the purchase money. Having got a conveyance to the estate, and never having paid the full consideration money, the court will enforce the implied lien for the amount unpaid. We have seen that from the allegations in the complaint, it did not appear that the respondent had waived or lost his lien; that the circumstance that he had taken independent and distinct securities for the purchase money did not affect his right to insist upon it, since he took those securities, relying upon the false and fraudulent statements of the appellants as to their value, and the responsibility of the persons giving them.

We are of the opinion the order of the circuit court overruling the demurrer to the complaint, was correct and must be affirmed, with costs.

DIXON, C. J., took no part in the decision of this case, as the same was tried before him at the circuit court.