GRAHAM *v.* MOFFETT.

1. VENDOR'S LIEN—CHATTELS TAKEN IN PAYMENT—MISREPRESENTATIONS AS TO VALUE.

    A vendor has no lien for damages resulting from fraudulent misrepresentations as to the value of chattels taken by him in payment for the land.

2. SAME—FRAUDULENT MODIFICATION OF CONTRACT—RESCISSION—STATUS QUO.

    Where a contract obligates the vendee to pay a given sum for land, and the vendor is afterwards induced, by fraud, to accept a chattel for the whole or a definitely-fixed portion of the price, he may tender back the chattel, and enforce a lien for the amount represented by it.

3. SAME—FAILURE OF CONSIDERATION.

    A vendor cannot affirm a contract whereby he agreed to take

chattels in part payment of the purchase price, and maintain a lien for a deficiency arising from the failure of the chattels to equal their represented value, upon the theory that to that extent the consideration was not fully paid.

4. VENDOR AND PURCHASER—FRAUDULENT INDUCEMENT—REFERENCE TO THIRD PERSON.

A vendor is equally responsible for fraudulent representations inducing the sale, whether they were made by himself or by a third person to whom he referred the vendee for information with the expectation that he would be deceived.

Appeal from Wayne; Donovan, J. Submitted November 16, 1898. Decided February 6, 1899.

Bill by Henrietta P. Graham against Viola G. Moffett and John S. Moffett to enforce a vendor's lien. From a decree for complainant, defendants appeal. Modified and affirmed.

*Haug & Yerkes* (*Edwin F. Conely*, of counsel), for complainant.

*Frank E. Robson* (*Otto Kirchner*, of counsel), for defendants.

HOOKER, J. On November 25, 1895, the parties to this suit made a contract in writing, by which the complainant agreed to sell a dwelling house and lot in Detroit to the Moffetts, husband and wife, and they promised to pay therefor $11,500, in manner following, viz. :

"Five hundred dollars in cash this day, 20 shares of Ingham County Savings Bank stock, and $5,500 cash, on or before November 30, 1895, and assume a mortgage of $3,500, the interest upon which is to be paid by said party of the first part,—paid to January 1, 1896."

This writing was the culmination of negotiations which covered a period of a week or more, during which most of the alleged misrepresentations are said to have been made.

On the 30th day of the same month, according to the

testimony of Moffett, he asked Graham, who acted in the
transaction on behalf of his wife, to take 5 shares more of
the stock, as he was a little short of money; and it was
finally agreed that the Grahams should take 11 shares
more, and the deed was delivered, and the consideration,
including 31 shares of the Ingham County Bank stock,
was paid, and the Moffetts entered into possession of the
property. Some 6 or 8 months later the bank went into
the hands of a receiver, and the evidence shows that an
assessment of 60 or 70 per cent. upon the stock will be
required to meet its obligations.

The bill in this cause was filed in February, 1897, and
alleges that Moffett fraudulently represented this stock to
be worth par, thereby inducing Graham to accept it at its
par value for a part of the purchase price, whereas it was
in fact of no value; and the bill prays the enforcement of
a vendor's lien for the amount represented by such stock
in the trade. The testimony of Graham shows that he
offered to return the stock to Moffett, and demanded the
property back, and that Moffett refused to accede to the
demand. This bill appears to have been framed upon the
theory that it was unnecessary to rescind the contract *in
toto*, but that, the fraud being shown in relation to the
stock, the vendor might treat the amount which it was
understood to represent in the transaction as unpaid, and
that the vendor's lien could be foreclosed to collect it.
Upon the same theory, we presume that it might be con-
tended that an action of *assumpsit* would lie, under the
rule that such an action may be maintained for the unpaid
price of real estate duly conveyed.

Lord Eldon, in defining the vendor's lien, used the fol-
lowing language:

" Where the vendor conveys, without more, though the
consideration is upon the face of the instrument expressed
to be paid, and by a receipt indorsed upon the back, if it
is the simple case of a conveyance, the money, or part of it,
not being paid, as between the vendor and the vendee, and
persons claiming as volunteers, upon the doctrine of this

court, which, when it is settled, has the effect of a contract, though perhaps no actual contract has taken place, a lien shall prevail; in the one case for the whole consideration, in the other for that part of the money which was not paid." *Mackreth* v. *Symmons*, 15 Ves. 329, 337.

There is nothing in this definition that justifies the inference that a vendor has a lien for damages resulting from a breach of a contract, and we know of no case where it has been expressly held that such is the law, unless it be cases hereinafter discussed. It merely secures the payment of the promised money or price. The agreed purchase price may be, in whole or in part, chattels; as an agreement to sell some land at an agreed price, for certain horses or bank stock, at a settled valuation. In case of such a contract, the vendor's lien would secure the performance of the promise, which would be to deliver the horses or the stock, not to pay money in lieu thereof; especially where, as in this case, the evidence shows conclusively that the vendee refused to take the property upon a money consideration. He may have been guilty of fraud in inducing the vendor to agree to take the stock as part of the consideration, but that fact will not authorize a court to make a different contract for him. It can only award him damages for the fraud, or permit a rescission of the contract. *Coit* v. *Fougera*, 36 Barb. 195; *Burns* v. *Taylor*, 23 Ala. 255.

There is a class of cases, however, in which a vendor's lien does exist, viz., where the contract obligates the vendee to pay a given sum for the land, and the vendor is afterwards induced, by fraud, to accept a chattel for the whole or a definitely-fixed portion of such purchase price. In such a case, the vendor may tender back the chattel, and enforce a lien for the amount represented by it. This is upon the theory that the pre-existing contract is binding. Its fraudulent modification being rescinded, the contract itself is left to stand, with its attendant right of lien in the vendor. The testimony is conclusive that this is not one of these cases as to the 20 shares; for not only

does the writing show it, but the testimony is all to the effect that Moffett would not agree to buy the premises unless the 20 shares of stock should be accepted in part payment.

It is now proposed to carry this doctrine a step further, and say that although the vendee never agreed to pay cash, and expressly refused to do so, yet inasmuch as he was guilty of fraud, thereby inducing the vendor to reconsider her determination to sell for cash only, and consent to an exchange for stock, that equity will, in addition to the legal remedy through an action for damages for the fraud, and the equitable one of rescission, recognize the vendor's right to affirm the contract, and maintain a lien for the deficiency arising from the failure of the stock to equal its represented value, upon the theory that to that extent the consideration was not fully paid. This is a persuasive view to take of the case. It is an expeditious way to relieve the complainant, and it removes whatever danger there might be of a failure to collect a judgment for damages for the fraud, should one be recovered at law. But, on the other hand, it introduces inconsistencies and far-reaching changes in the law. It enlarges the vendor's lien to include damages for a breach of contract as well as the unpaid price agreed upon. It introduces an element of uncertainty, by making it cover unliquidated claims, which have hitherto generally been excluded. It revolutionizes the doctrine of rescission, which requires a party to rescind a fraudulent contract *in toto* or affirm it as made. It allows the vendor to keep the chattel, and recover the damages in equity,—a thing hitherto almost unknown.

There is a temptation to do full and complete justice between parties, if possible, especially where fraud is apparent, that tends to the extension of rules [of law, which should only be made after careful consideration, for every innovation against the logic of the law is productive of confusion. In this case it would be gratifying if we could settle this matter here, instead of requiring the complain-

ant to pursue her legal remedy; but an illogical extension of the law of vendor's lien to cases involving unliquidated damages for fraud would be a heavy price to pay therefor. Certainty in the law is a growing necessity, and the broader the rules can be, consistent with general justice, the better. There is always danger in disregarding the logic or reason of a rule of law, sometimes not so discernible at the time as on later occasions, when the consequences confront the courts in other cases. It may be a simple thing in this case, and justified by the proof, to say that this stock is worth nothing, and therefore that the measure of recovery—may we not as properly say damages?—is plain; but it would not be so easily and accurately determined if the chattel were a spavined horse.

We are cited to a few cases which are alleged to support the practice contended for by the complainant. Our own case of *Merrill* v. *Allen*, 38 Mich. 487, fails to reach the point in controversy, as in that case the agreement was to deed premises in part payment for other land. It was held that a lien existed when such premises were not deeded as promised, which is a different thing from asserting a lien after conveyance, because of a fraudulent representation of value. *Tobey* v. *McAllister*, 9 Wis. 463, is more nearly in point, but that case was heard upon demurrer, and we do not know what the contract was. In disposing of the case, the court says, speaking of certain notes of third parties:

"For if we were of the opinion that the respondent, by taking such securities, and trusting to the responsibility of third persons, thereby lost the implied lien upon the property which the law would otherwise have given him, yet that certainly cannot be the case if there was fraud in the transaction."

This indicates that the vendor had a lien under the contract for the purchase money, of which he was deprived by fraud. It differs from our case, for here the purchase price was not money, but an agreed chattel, which was delivered. The question now under discussion does not

seem to have been raised, and the only proposition that appears to have been decided is that where one substitutes another's obligation for his own, through fraud, it does not release him from his obligation,—a rule that is undoubtedly the law.    Two other Wisconsin cases are cited, but they do not throw light upon the question.

A case will be found, however, which seems on all fours with the one before us, and a lien was sustained, reversing the vice chancellor, who dismissed the bill upon the ground that the vendor's claim was one sounding in damages, and that there could not be a partial rescission of a contract. See *Bradley* v. *Bosley*, 1 Barb. Ch. 125.    With this exception, our attention has been called to no case like the present one.

Our examination of the testimony satisfies us that, at the time this contract was made, Dr. Moffett knew that the bank was insolvent.    He admits that he had anticipated a run upon it, and that the bank had closed its doors on a former occasion, while he was a large stockholder, a director, and a member of its discount or loan committee. He then incurred the criticism of the other stockholders for withdrawing a large deposit to avoid loss through a run which he anticipated, and which actually followed a few days afterwards, causing the suspension of the bank. The bank was reorganized, but, although he continued to hold his stock, he preferred to keep his account elsewhere, and never afterwards intrusted his funds to its keeping. He represented to Mrs. Graham and her husband that the stock was valuable, and was worth par; and we think the testimony justifies the statement that he did not content himself with stating an honest opinion as to the value of the stock, but used persuasion to induce the belief that it was valuable and worth par.    The evidence convinces us that Dr. Moffett knew that this stock was not worth par, if he did not fully believe that it was worse than valueless, because likely to be assessed to pay debts.

Upon the part of the defense it is said that relief should be denied because the doctor's representations were not

the inducement upon which the complainant took this stock, but that she and her husband took other measures to ascertain the value of this stock, and relied upon the statement of the president of the bank that it was worth par, and that he would give par for it.   There is testimony that, during the negotiations, Dr. Moffett represented that other stock of the bank had been sold or traded at par and above; and proposed that Mr. Graham consult the president of the bank, Mr. Ulrich, who lived at Mt. Clemens, offering to go with him for the purpose, but ultimately offering to pay the expense of telephoning to him.   Thereupon Graham telephoned to him, and was informed that the stock was worth par, and he would pay par for it. This he afterwards refused to do.   Graham and his wife testify that they relied largely upon what Dr. Moffett said, but it is claimed that the testimony shows the contrary; and it must be admitted that there are, in their testimony, statements which indicate that, after receiving this information, they yielded to Dr. Moffett's solicitation, and took the stock.   Moffett testified that he had no understanding with Ulrich, and that he was not even acquainted with him, and there is no testimony showing the contrary; yet it is manifest that, had Ulrich or Moffett stated what we believe that they must have known about the condition of the bank, the stock would not have been accepted by the complainant, and we cannot avoid a suspicion that Moffett relied on an anticipated reluctance upon the part of the president to state the true condition of the bank, or value of the stock, which, under the circumstances, would probably have been hazardous to the bank.   We cannot persuade ourselves to believe that Moffett did not know that the stock was worth much less than par, and, that being so, it was a fraud to induce Graham to seek information which he hoped would be false.   We are of the opinion that, when one wishes to take advantage of his fellow, he cannot shelter himself behind the doctrine of *caveat emptor*, if he either makes misrepresentations himself or designedly sends him to one whom he expects to give him false infor-

mation, and allows the contract to be consummated with knowledge that the other party is acting on such false information. Either is fraudulent, and it matters not which is the inducement that operates on the mind of the victim. But the acceptance of the 11 shares grew out of a later conversation, in which, according to Mrs. Graham's testimony, renewed assurances of value were asked of and given by Moffett, and we should hardly go so far as to protect the defendants in an unconscionable transaction through a presumption that Mrs. Graham did not rely upon Moffett's statements, but did upon Ulrich's.

It is said that it was the duty of the complainant to act promptly on discovering the fraud, by rescinding the contract; that she delayed for six months after learning the fact, in January, 1896; and that she never made a tender of the remainder of the consideration. Mr. Graham testified that he made demand for a reconveyance in January, and offered to pay back what he had received, and that Dr. Moffett said that he would not do it. Dr. Moffett denies this, but we infer that the circuit judge believed Mr. Graham's statement; and a refusal to accept a tender makes proof of a formal tender unnecessary, even in an action at law.

We have seen that there may be cases where the chattel is taken as a substitute for an existing obligation to pay money, and, again, that it may constitute the whole or a partial consideration for the original contract. This case illustrates both classes of cases. The agreement was to make payment by 20 shares of stock, agreed to be worth $2,000, and the assumption of a mortgage, and the remainder in cash. Afterwards the vendor was induced to allow the vendee to substitute 11 additional shares of stock for $1,100 of the sum which he was under contract obligations to pay in cash. As to the 20 shares, there was no lien, because they were delivered as promised; but as to the 11 shares the lien would exist, if their substitution was permitted by reason of the fraud of the vendee.

We regret that we cannot afford the complainant full

relief, but settled rules of law forbid. The decree of the circuit court will be affirmed to the amount of $1,100, with interest from the date of the deed. As to the excess, it will be reversed, and the complainant left to her remedy at law. The defendants are entitled to costs of this court.

The other Justices concurred.