**INVESTMENT REGISTRY, Limited, v. CHICAGO & M. ELECTRIC R. CO. et al.**

**WESTERN TRUST & SAVINGS BANK et al. v. SAME.**

(District Court, E. D. Wisconsin. January 29, 1924.)

No. 80.

**1. Compromise and settlement ⬤⟳23(3)—Evidence held insufficient to show railroad fraudulently induced owner to accept its bonds in compromise of condemnation award.**

In suit to enforce vendor's lien against property conveyed to railroad and subsequently sold under foreclosure, evidence *held* insufficient to show that owner was induced to accept railroad's bonds in amount in excess of condemnation award, from which it had appealed, by railroad's fraudulent representations as to its financial condition.

**2. Vendor and purchaser ⬤⟳254(1) — Vendor's lien based on vendor's right to receive agreed price.**

Vendor's lien is not existing interest in land, nor is it based on contract, but it is creature of equity, and is based on vendor's natural right to receive agreed price, and becomes assertable on vendee's failure to pay.

**3. Vendor and purchaser ⬤⟳266(1)—Vendor's lien lost by conduct of party showing intention repugnant to lien.**

Vendor's lien for price may be lost by conduct of parties showing intention repugnant to continuance of lien.

**4. Eminent domain ⬤⟳243(1)—Judgment in condemnation affords complete protection, and precludes assertion of equitable lien.**

Parties to condemnation proceedings are in no sense vendor and vendee, and judgment therein affords complete protection to both parties, and precludes higher form of security, in nature of equitable right to assert lien, if award is not paid.

**5. Eminent domain ⬤⟳262(1)—Under Wisconsin law, appeal from condemnation award merely opened issue respecting amount of compensation, and not right of condemnitor to enter on premises.**

Under Wisconsin law, appeal from condemnation award for land taken for railroad merely reopened issue respecting amount of compensation, but right of railroad to enter on payment of award could not be reviewed.

**6. Liens ⬤⟳7—Vendor and purchaser ⬤⟳254(4)—Compromise of proceedings held repugnant to any vendor's lien for amount unpaid, or equitable lien.**

Where railroad, in compromising condemnation proceedings for right of way, covenanted to deliver specified number of its bonds for amount in excess of award, and for their repurchase two years later by its president, and for dismissal of proceedings, contract was repugnant to existence of any vendor's lien, or any other equitable lien.

In Equity. Consolidated suit by the Investment Registry, Limited, against the Chicago & Milwaukee Electric Railroad Company and others, with cross-bill by the Western Trust & Savings Bank and others against the Chicago & Milwaukee Electric Railroad Company and others. In the matter of the petition of the Filer & Stowell Company to establish and enforce a vendor's lien. Petition dismissed.

George P. Miller, Edwin S. Mack, and J. Gilbert Hardgrove (of Miller, Mack & Fairchild), all of Milwaukee, Wis., for petitioner.

Lessing Rosenthal (of Rosenthal, Hamill & Wormser), of Chicago, Ill. (Willard L. King and F. Howard Eldridge, both of Chicago, Ill., of counsel), for respondents.

GEIGER, District Judge. The case is before the court upon the merits of the petition of the Filer & Stowell Company, whose subject-matter had been incorporated in a complaint in the circuit court for Milwaukee county pursuant to an order of this court, which order was revoked on March 19, 1917, to the end that the issues be determined in the court having jurisdiction of the property affected. See Investment Registry, Limited, v. Chicago & M. Elec. R. Co., 251 F. 510, 163 C. C. A. 504. Notwithstanding the years of litigation, and the numerous reported decisions dealing with various phases of this matter, the question presented necessitates preliminarily noting the chronology of the steps in the litigation; also, some detail of the facts evidencing the transaction between the petitioner and the railroad company.

The Chicago & Milwaukee Electric Railroad Company was organized under the laws of Wisconsin in June, 1904. On January 28, 1908, upon a bill then filed, this

court (the United States Circuit Court, as its predecessor) appointed receivers at the instance of the Sovereign Bank of Canada. The railroad company at that time owned a railroad, not fully completed, extending from the southern boundary line of Wisconsin, through the counties of Kenosha, Racine, and Milwaukee, into the city of Milwaukee, but some two years prior thereto had executed a lease to an Illinois corporation, which described its property as extending from the village of Lake Bluff, in Illinois, to Kenosha, in Wisconsin, and then had under construction the extension of its road from Kenosha into the city of Milwaukee. The lessee corporation operated the road down to the time of the appointment of the receivers.

On March 27, 1908, the petitioner, Filer & Stowell Company, in the cause instituted as above noted, filed its petition representing that it had sold to the railroad company certain premises, for which the sum of $160,000 was agreed to be paid, and that the petitioner had an equitable vendor's lien upon the premises. Leave was asked to institute suit in the state court to establish this lien. Such leave was granted on the same day, and on the following day the petitioner began its suit in the circuit court for Milwaukee county against the railroad company, its receivers, and the trustees under a mortgage of the railroad company, dated January 1, 1905, and securing $10,000,000 of bonds. The complaint charged the sale of the property for $160,000, on or about October 30, 1907, its conveyance by the petitioner to the railroad company, and that by reason of the failure of the latter to pay the purchase price the petitioner had an equitable vendor's lien upon the premises, which was asked to be established and adjudged to be superior to the lien of the trust mortgage. Such complaint was amended on November 5, 1908, by charging that the plaintiff (the petitioner here) was induced to accept bonds of the railroad company in place of money by alleged fraudulent representations on the part of A. C. Frost, acting as president of the company; that the railroad company had taken possession of the premises sold, had begun the construction of its railroad track thereon, and made the premises a part of its right of way. An offer was made in such complaint to make such disposition of its bonds and the agreement of Frost with reference to the bonds (to be referred to) "as this court may adjudge just and equi-

table, as a condition of and for the enforcement of the plaintiff's said vendor's lien."

In the receivership suit in this court, the trustees under the railroad company's mortgage subsequently appeared, filed a cross-bill to foreclose their mortgage—the petitioner herein being a party defendant to the cross-bill—and the receivership and foreclosure cases, and all other litigation growing out of it, passed into a consolidated cause. A foreclosure decree was rendered August 7, 1912, the court reserving jurisdiction to hear and determine the petition of the mortgage trustees to vacate the order granting leave to the petitioner to sue in the state court, and likewise to hear and determine the issues involved in, or concerning, the claims of the petitioner herein to, upon, or in respect of any of the property mentioned in the decree. See 251 Fed. 510, 163 C. C. A. 504.

The petitioner, Filer & Stowell Company, in October, 1907, owned a large manufacturing plant upon land near the southern limits of the city of Milwaukee, a portion of which the railroad company sought to acquire for the purpose of extending its road to and into the city of Milwaukee. Condemnation proceedings instituted in the circuit court for Milwaukee county had progressed to the point of an award to the petitioner in the sum of $115,000, and under the law of Wisconsin the railroad company was then privileged to enter upon the possession of the property by paying the award into court for the use of the condemnation respondent. The latter, however, the petitioner herein, being dissatisfied, took an appeal from the award of the commissioners to the circuit court for Milwaukee county, where, under the Wisconsin statute, the amount of the damages awardable was subject to be heard de novo.

In this situation the parties entered upon negotiations concluded by written contracts now in evidence without controversy or dispute. It is quite immaterial which of the two parties be regarded as the more eager to effect an adjustment of the pending condemnation proceeding, or any controversy therein. No sort of doubt exists respecting—

(1) The initial purpose of the railroad company to abide by the award of the commissioners and to pay the money into court.

(2) The notification to the railroad company of the herein petitioner's purpose to appeal from the award.

(3) The willingness on the part of the railroad company to discuss and consider

bases of adjustment and disposition of the condemnation controversy.

(4) The insistence on the part of the petitioner that it receive from the railroad company more favorable terms.

(5) The insistence on the part of the railroad company that any augmented award effected by compromise could not and would not be paid in cash.

(6) The insistence by the railroad company that it could not and would not secure any obligation for more favorable terms, by mortgage or other lien upon the specific property involved.

As noted, the petitioner initially moved this court, by its averment that it had a vendor's lien upon certain property in the possession of the receivers, and praying that it be allowed to proceed in the state court for the assertion and enforcement thereof. Pursuant to leave granted, and on or about March 28, 1908, it filed the suit in the circuit court for Milwaukee county referred to, charging that it had sold a parcel of land to the railroad company for $160,000, on or about October 30, 1907, and that by reason of the sale and conveyance and the failure of the railway company and its receivers to pay the purchase price, "this plaintiff has an equitable vendor's lien upon said premises and the whole thereof, which lien is prior and superior to the lien of the * * * mortgage or deed of trust to said defendants," the mortgage trustees, who had been made parties to the state court suit. Judgment was prayed for an equitable vendor's lien upon "said premises"—the conveyed premises. In such suit, the receivers and the trustees under the mortgage answered, denying the existence of a lien, and setting up the improvement and incorporation of the conveyed property as a part of their line of railroad, "now, and for about a year last past, * * * in actual operation from Highwood, Ill., * * * to the city of Racine, Wis., and is nearly completed and ready for operation up to said southerly line of the city of Milwaukee."

On November 5, 1908, the state court complaint was amended, by charging the agreement as one of sale to the railroad company "for the sum of $160,000," and that said sum "and the whole thereof became due and owing to the plaintiff immediately upon the execution and delivery of the instrument of conveyance aforesaid, to wit, on or about the 30th day of October, 1907," but that the defendant, the railroad company, "not wishing to pay said sum of $160,000 in money, at the time of said conveyance, induced said plaintiff to accept in place thereof, for the time being, one hundred and sixty bonds, of the denomination of $1,000 each, * * * and purporting to be secured by an alleged mortgage or deed of trust on certain property of said defendant railroad company, and simultaneously therewith, and as a part of said transaction, and as part consideration for said conveyance, and the acceptance of said bonds as aforesaid, the said defendant railroad company undertook to procure a purchaser for said bonds who should purchase from said plaintiff within two years from said 30th day of October, 1907, said $160,000 of bonds at par and accrued interest, and in accordance with said undertaking the said defendant railroad company did procure A. C. Frost to enter into an agreement to purchase the bonds at the time and on the terms above set forth; that it was expressly understood and agreed between said plaintiff and said defendant railroad company that the acceptance of said bonds and the said agreement of said A. C. Frost should not be or constitute a waiver by said plaintiff of the vendor's lien of said plaintiff."

And the amended complaint averred that, to induce the plaintiff to accept the bonds and the agreement of Frost, the latter, acting as president of the railroad company, represented to the plaintiff "that the following facts were true, to wit: (1) That said railroad company had practically no floating indebtedness; (2) that the proceeds of all of the bonds issued by said defendant railroad company under the aforesaid mortgage (being part of the same issue as said 160 bonds as aforesaid) had been actually used in the construction of the railroad of said defendant railroad company; (3) that said defendant railroad company had earned each year for several years a handsome surplus over its operating expenses and interest charges; and (4) that said Frost was perfectly responsible and able to fulfill his said agreement."

It was further averred that each of the foregoing statements was false and untrue, to the knowledge of Frost and the railroad company; that the defendant railroad company had a large floating indebtedness, in excess of $500,000; that the proceeds "of a large number of said bonds issued under said mortgage * * * were not actually used in the construction of said railroad"; that said company had not earned "a surplus in any year, but that in each and ev-

ery year * * * it had had a large deficit," and that Frost in fact was not responsible or good for said agreement, but was largely involved and wholly insolvent; that the plaintiff believed the statements to be true, and acted in reliance thereon in accepting the bonds and the agreement of Frost; and that plaintiff "did not discover, and had no reason to believe, said statements to be false until in or about the month of September, 1908."

The complaint avers that "by reason of the foregoing facts the plaintiff has an equitable vendor's lien upon said premises and the whole thereof, and also upon the whole of said railway line of said defendant, of which said premises have been made a part, and which lien is prior and superior to the aforesaid mortgage or deed of trust to said defendants."

After this court reasserted its jurisdiction (see 251 Fed. 510, 163 C. C. A. 504), and on September 4, 1918, the petitioner, Filer & Stowell Company, by an amended petition in this court, set up the sale of October 30, 1907, following the allegations of the amended complaint in the state court respecting the inducement to accept in place of cash $160,000 of bonds, and the contract of repurchase; and also the alleged representations made by Frost on behalf of the railroad company; and prayed for the establishment of a vendor's lien, not only against the premises conveyed, but against the whole of the line of railroad, superior to the lien of the mortgage.

Keeping in mind the attitude of the respective parties at the time when the award in the condemnation proceedings had been made, and upon which the absence of any doubt has been noted, it becomes necessary to examine the case in the light of evidence offered upon the issue tendered by the present petition. It will, perhaps, simplify matters if reference be first made to the things done by the respective parties which appear without controversy:

After the condemnation award, when the petitioner had expressed its dissatisfaction therewith and disclosed its purpose to appeal, an interchange of suggestions that an adjustment or compromise be effected led to conferences. Therein offers and counter offers were made. Without doubt —in view of the contract actually entered into—the parties, in addition to disclosing the prime question arising over the amount of the award and any augmented or compromise amount, dealt with great precision in attempting to dispose of important, though perhaps more subordinate, features attending the entrance of the railway company upon a right of way through petitioner's premises. Thus, after reciting the mutual desires to adjust the condemnation controversy, the agreement stipulated:

(1) The delivery of $160,000 of "first mortgage five per cent. (5%) Wisconsin division bonds, with January, 1908, coupons attached" to the petitioner upon the railroad company's receiving a warranty deed covering the premises in question.

(2) The construction by the railroad company of an opening across the right of way according to plans, for the benefit of the petitioner.

(3) The reservation to the petitioner of the right in the future to build subways across the right of way

(4) The grant by the railroad company to the petitioner of a right for a driveway to be constructed as indicated.

(5) A stipulation granting to petitioner the right to remove a portion of its foundry building located upon the property in question, to retain the materials, and to remove all other buildings within the agreed right of way, the railroad company agreeing to cancel the then existing contract with a third party covering that subject-matter, or at the option of the petitioner assign such contract to the petitioner.

(6) The agreement of petitioner to give to the railroad company a merchantable title to the 150-foot right of way described.

(7) The grant to the railroad company, by appropriate conveyance, of the right to use a strip 25 by 400 feet east of the right of way for the purpose of maintaining the slope of its embankment.

(8) The dismissal of the condemnation proceedings.

This agreement was dated October 30, 1907, and contemporaneously therewith the petitioner was given an agreement by A. C. Frost, the president of the railroad company, whereby, in consideration of the petitioner having agreed to accept $160,000 of the bonds in full payment of the property agreed to be conveyed, Frost agreed to repurchase the bonds, or any part thereof, that the petitioner desired to sell at par and accrued interest within two years from October 30, 1907; the time of purchase within said period to be at Frost's option. The warranty deed and also an instrument granting to the railroad company the right to use the 25-foot strip for embankment support were delivered as called for by the

agreement. Frost also delivered to the petitioner the bonds.

An examination of all of the papers and documents drawn and executed upon adjustment of the condemnation controversy prompts the observation that they are models of simplicity and accuracy of statement. The parties had succeeded, if such was their aim, in covering the whole situation by stipulations which exhibit a clear conception of the subject-matters to be given and to be received respectively. The petitioner avers in its amended pleadings that false and fraudulent representations induced it to enter into the arrangement, by reason whereof it is entitled to some kind of relief, the equivalent of or better than that grantable in equity upon the assertion of a right to a vendor's lien. In this situation, it becomes necessary to determine whether, upon the facts as adduced in the testimony, fraud, in a legal sense, can be found.

[1] The petitioner, Filer & Stowell Company, is a corporation engaged in manufacturing, and in 1907 had a capital of $1,200,000, all of which was owned by Thomas J. Neacy and Walter Read, who were its officers and on its behalf conducted all of the negotiations with the railroad company. They were men of recognized ability in the business world. The testimony shows clearly that from the earliest they had taken an interest in the projection of this railroad venture, and, long prior to the time when the controversy herein arose, they had conferred and communicated with the officials respecting the location of the road. The proof of the oral and written communications with Frost, the president of the railroad company, leaves no doubt upon the subject. It indicates an interest referable in part to public spirit, but also largely to advantages believed to accrue to them and to their company through the projection of the road. The matter, of course, took on an acute aspect when the railroad company reduced its right of way to such a concrete location as necessitated taking, not only some of the petitioner's land, but likewise a new factory building erected thereon. The efforts of Read and Neacy to induce the company to relocate its right of way, and the failure of all negotiations to that end, and probably like failure to agree upon price and damages, brought on the condemnation proceedings.

As noted, such proceedings were appealed by the petitioner, because of its unwillingness to accept the award of $115,-000, although the railroad company indicated its satisfaction and its purpose to pay the amount into court. Now, in considering the testimony, it is inconceivable that at that time—very shortly whereafter the occurrences now complained of took place—the petitioner's representatives in any fair sense could be considered as novices in respect of the matter in hand, unacquainted with the actual situation as it disclosed a new railroad venture whose future, naturally, was problematical, or that, in the light of the long history—that is to say, a year or more—of the pendency of the project, so far as settling the right of way was concerned, they were likely to be easily misled or overreached in their efforts to conclude what was best in the settlement of terms by which the condemnation proceeding was superseded. The whole matter had gone beyond determining whether or not they would *sell*. The land had in effect been taken and the dispute concerned *damage*. At the outset—the parties conceiving such to be the situation—the petitioner knew that, if the amount of the award was to be augmented by *agreement*, it was bound to recede from the position in which the law had placed it under the condemnation proceedings, viz. the right to receive cash. It likewise knew that, if by agreement some other or different terms were to supersede the condemnation proceeding, in no possible way could it receive a specific lien upon the property to be taken. The testimony shows beyond question that these were conditions which the petitioner sought to avoid, but could not, because the railroad company would not consent. It shows that that was the reason for offering bonds or promises of the railroad company in an augmented figure.

Therefore it is of interest to consider the testimony given by Read and Neacy upon this narrow phase of the case in determining whether or not they were really overreached—whether there was fraud committed. Although disaster overtook the railroad company within a short time after the perfection of this compromise, and the petitioner moved with some promptness to assert the vendor's lien for the unpaid "purchase price," nearly a year elapsed before there was any suggestion that the petitioner had been "defrauded." It is fair to presume that, if false representations made by Frost were the inducing cause of the settlement, proof thereof would be rather clearly outstanding in the testimony of both Read and Neacy. By this is meant that if,

as is now suggested, Read and Neacy conceived the agreement entered into to have the effect in law and in fact of giving them what was then represented and believed to be the then equivalent of $160,000 in gold, certain things would be present in the testimony, and certain things now present therein would, as a matter of likelihood, be absent.

Taking first the representations charged to have been made that "Frost was perfectly responsible and able to fulfill his agreement," the query at once arises respecting the office of the Frost agreement upon the petitioner's right to assume that, after taking the bonds and Frost's agreement, it had reserved any right thereafter to ask for a vendor's lien. That the relations between Neacy and Read upon one hand, and Frost upon the other, were cordial, and embodied confidence and belief in the latter's honesty, is true, for it is so testified; that Frost affirmatively represented his responsibility and ability to fulfill his agreement is not even testified. That Read and Neacy may have believed Frost to be financially responsible and able to carry out his agreement is probably true, but that such belief was induced by anything which Frost said or did at the time of entering into the agreement, without which they would have refused to enter thereon, is not even suggested.

Passing to the representation that "the proceeds of all of the bonds issued by the railroad company under its mortgage had been actually used in the construction of its railroad," it is important to note that the meaning of the "railroad company" in the minds of Neacy and Read seemed to be quite vague and uncertain. When it is conceded that there were two distinct properties, owned by distinct corporations, covered by leaseholds, and the bonds of the one corporation guaranteed by the other, all of which was open to almost instant ascertainment, the materiality and the inducing quality of the representation, to say nothing of its falsity, is not at all clear upon the proofs. One of the witnesses testified to a representation that the proceeds of the "Wisconsin bonds" were used for the Wisconsin division wholly, but the other failed to testify thereto. Apparently both assumed that the Wisconsin and Illinois corporations and the railroad constituted a single line, whereas the actual situation was open to ascertainment upon slight inquiry. Neither of the witnesses, upon any construction of his testimony, justifies the conclusion that a representation was made which in fact confused him in supposing that it was one rather than the other, or either, in reliance whereon he acted.

Turning to the next specification, namely, a representation that "the railroad company had practically no floating indebtedness," one of the petitioner's witnesses testified that a statement was made that the company was "free from floating indebtedness," or "something to that effect; that is, had its obligations well in hand." If attention is concentrated upon the particular railroad company engaged in the venture in which petitioner was concerned, because of the projection of a right of way across its land, it may be queried what a representation of "a floating indebtedness" in connection with an incomplete railroad would ordinarily mean, and what petitioner's witnesses at that time could justifiably have believed it to mean. Assuming that the existence or nonexistence of a large general indebtedness subordinate to proffered bonds might be a circumstance pertinently to be taken into account in determining the probability of embarrassment coming from any source, there is nothing in the record suggesting that at that time it was in the mind of either of the parties as a possible turning point in any negotiations. Very likely Frost, in his position as a promoting executive, did not talk disparagingly of the venture; very likely favorable, rather than unfavorable, prophecies were made. Very likely the interest which petitioner's witnesses had manifested for a long time toward the consummation of the project was availed of by Frost in pressing his side of the negotiation for adjustment of the condemnation controversy; but that petitioner and its witnesses Neacy and Read were cajoled into the belief that the larger figures which were to be read into the contract under which they were to take bonds were in fact a larger number of dollars practically in hand is not supported by the testimony in this case.

These same considerations are pertinent upon the other alleged representation that the railroad company had earned each year for several years a handsome surplus over its operating expenses and charges. It is hard to believe that Neacy and Read, knowing that, so long as the "road" was subject to the obligations and hazards of construction and completion of a large portion of its line, and was therefore a problematical operating venture, it could yet be the subject of representation to be relied on in re-

spect of earning a "surplus" for *several* years, or that its current earnings or burdens were susceptible of statement as a safe basis upon which to value bonds to be issued largely for construction purposes. Neither Read nor Neacy at that time could have believed that a new interurban railway from Chicago to Milwaukee, still building, was none the less a paying venture in the sense that revenues were in excess of expenditures; that either was then calculable on the basis of experience to aid in determining with fair accuracy the value of bonds issued almost wholly for construction purposes. True, a portion of the line had been completed, was in operation, and with respect to that a showing was possible—a showing which furnished a basis upon which some estimate or prophecy respecting the complete venture might be indulged. That a printed financial statement was given to the petitioner's officers is not denied, but that they examined it is denied by themselves. In other words, the testimony cannot support the conclusion that the petitioner made the contract and took the bonds in reliance—either actual or imputed—upon representations dealing with the character of the property or the venture which secured the bonds, and which representations gave with any sort of nicety the things usually found in a financial statement or representation, and which things are shown to be false.

The inability of the witnesses to make out representations, except upon vague and general bases, enables the court to reject the claim of fraud upon the ground of the infirmity of the testimony—certainly when tested in the light of antecedent probability. I am well satisfied that Read and Neacy, representing the petitioner, were entirely cognizant of the situation when once—according to their own testimony—the railroad company, through Frost, flatly refused, after offering to pay the condemnation award into court, to pay any augmented sum in cash, or to secure it by specific lien upon the property. They proceeded thenceforward to negotiate with Frost in the light of hazards which arise upon railroad bonds. The whole situation discloses clearly that they were from then on seeking to obtain the largest possible amount of bonds, because of, first, the impossibility of getting a larger amount of cash; and, second, their unwillingness to take the smaller amount of $115,000 in cash; and, third, the necessity otherwise of further prosecuting and taking the hazards of the condemnation proceeding.

But with the situation as thus outlined, and regardless of the necessity or possibility of finding fraud, the petitioner's contention that it is entitled to relief in equity analogous to the assertion or enforcement of a vendor's lien, solely because petitioner has not been paid, challenges attention in the light of comparative results. It is all reduced to an insistence upon enforcing a claim of $160,000. Now, that figure was never agreed upon, except as it is found in bonds of long maturity, secured by the property taken and by all other property of the company. When, therefore, petitioner asserts a right to a "lien" against the whole property of the company, superior and paramount to that of the mortgage securing the very bonds which it agreed to take, it seeks a position which is better than that which it could have obtained, and would have had, upon rescission of the agreement and restoration of the status quo of the condemnation proceedings; better than the agreement as made, if affirmed, because of priority and acceleration of payment of a larger amount (never agreed upon, except in bonds); better than upon rescission of the entire agreement and enforcement of a lien upon the particular property, because, in the absence of a larger assessment in the condemnation proceedings, or in the absence of the agreement now sought to be either repudiated or changed, the railroad company was under liability to pay $115,000. And, as will be hereafter noted, the payment of that sum was a condition precedent to the railroad company's enjoying any benefit of the proceedings.

The object, in effect, is to retain the figures, $160,000 found in the agreement, but to translate them not only into money presently payable, a thing refused by the company in October, 1908 (as to any amount in excess of $115,000, then obligated by the condemnation proceedings), but to compel payment preferentially over other bonds, a thing to which the company could not agree to the prejudice of other bondholders, after petitioner had taken the bonds; and, further, the object retains for the petitioner every other advantage, and subjects the railway company to every burden or disadvantage of the contract.

The foregoing statement of the matter, regardless of a finding of fraud, raises the inquiry whether the principles of equity controlling the assertion and enforcement

of a vendor's lien are at all applicable. Counsel for the petitioner seem really to concede that there has been a complete foreclosure to assert and enforce rescission, likewise to assert and enforce a vendor's lien against the particular property which was the subject matter of the condemnation proceedings. But it is asserted, with respect to the first, that, although the precise remedy is not available, equity should not refuse to give the same, or even larger, relief in some sort of a way; that is, though a judgment of rescission could not be awarded, the court should declare the equities to be the equivalent of those which would sustain a rescission, and, nothing else being available, award, as an alternative of rescission and restoration, a lien of paramount dignity against the whole property, and again, because a vendor's lien is not available or enforceable against the particular property, respondents should not complain if the express agreement, instead of being rescinded, be ignored, in whole or in part, and a vendor's lien of paramount dignity cast against the entire railroad property.

[2] Upon the fundamental aspect of a vendor's lien, that it is a creature of equity, in no sense an existing interest in land, nor as resting in contract, but receiving recognition because of a natural right to have the price paid for land as it was agreed it should be paid, the parties here are in accord. The fact that the price has not been paid is fundamental, and is the starting point upon making a claim in equity for a lien. Therefore, when parties have bargained for land for a price stipulated to be money in hand, upon default of payment by the vendee, it is ordinarily clear that his default should not acquit the land in his possession of his obligation to pay. In other words, the lien is then assertable, cognizable, and enforceable as a matter of plain equity. So, having in mind merely the fundamental fact, it makes little difference what formula is used to express the manner of creation of the lien; whether it be imputation, implication, conformity with presumed intention, or merely that it arises or springs into existence within equitable cognizance.

[3] But, notwithstanding the universality of recognition of this fundamental aspect, limitations upon the principle are recognized, and equally immaterial is the form of expressing limitations. Whether the circumstances lead to characterization as "waiver," "loss," "repugnancy of intention," "exemption," or as "preventing implication," each reflects the exceptional principle as one of equitable limitation.

The authorities from the earliest indicate that, when the principle governing the lien is invoked upon the asserted fundamental fact of nonpayment of an agreed purchase price for land, the exercise of the equitable power and right is thereupon dependent, first, upon ascertaining this fundamental fact; and, secondly, upon finding the conduct of the parties consistent therewith. The characterization of the lien as the "most fragile of all equitable liens" (Whiteley v. Trust Co., 76 F. 74, 79, 22 C. C. A. 67, 34 L. R. A. 303), recognizes this dependency upon conduct of parties; the idea undoubtedly being that, while the right of the vendor may exist so long as the liability of the vendee is in its simplest form, conduct of the possessor of the right must remain consistent with both the fundamental right and liability. He cannot seek to retain the right, and yet bargain repugnantly toward such retention. The matter has been stated in a variety of ways, such as:

"Now, if it appears, as in our opinion it clearly appears, upon the face of these instruments, and from the nature of the transaction, that the parties were bargaining for the security, and not for a stipulated sum, no question of lien arises, because here the purchaser has actually received the consideration." Parrott v. Sweetland, 3 M. & K. 655, 665.

And "it would be quite inconsistent with the mode in which the parties have dealt to say that there is still an ulterior, latent equity for the purpose of securing the" purchase price "in a manner in which neither party ever thought that it was to be secured; and it is evident that they did not think that it was to be so secured from their having taken a specific security for it." Buckland v. Pocknell, 13 Sim. 406, 411.

The cases cited by the respondents leave little room for discussion respecting these elementary views upon which the existence, initial or continued, or the enforcement or denial of the existence of the right to the lien depends. Whiteley v. Central Trust Co., 76 F. 74, 22 C. C. A. 67, 34 L. R. A. 303; Slide & Spur Gold Mines v. Seymour, 153 U. S. 509, 14 S. Ct. 842, 38 L. Ed. 802; Graham v. Moffett, 119 Mich. 303, 78 N. W. 132, 75 Am. St. Rep. 393; Welch v. Farmers' Loan & Trust Co., 165 F. 561, 91 C. C. A. 399; Bayley v. Greenleaf, 7 Wheat. 46, 56, 5 L. Ed. 393; Brown v.

Gilman, 4 Wheat. 255, 4 L. Ed. 564. The English cases are fully discussed in these decisions.

We proceed, then, to an application of these elementary principles to facts, entirely without controversy, bearing upon the conduct of the parties, to answer the question whether in the nature of the transaction, the lien should be recognized, or, in the language of Chief Justice Marshall, this is "a clear case of exemption from lien." Brown v. Gilman, 4 Wheat. 291, 4 L. Ed. 564.

[4] I think it is quite important to approach the consideration in the light of the relationship of the parties at and prior to the time the contract in question was made. Clearly, when, after long negotiation, howsoever friendly, these parties failed to agree upon a transfer of a right of way, whereupon condemnation proceedings were initiated, they were then in no fair sense in the position of vendor and vendee; nor were they such during the pendency of such proceedings, nor at the time of the award, nor of the pending appeal. Certainly the petitioner herein should not be regarded as having a voluntary status in such proceedings. It was compelled to be and remain therein. The proceedings sought to accomplish compulsorily, in a legal sense, a *taking* of property. It carried with it satisfaction of the right which the respondent therein (petitioner here) may have had to or for just compensation. Hence, when the elements of the proceeding had been fully dealt with, the respondent therein could not in any fair sense be regarded as in a position analogous to a vendor. It was subjected to the taking of its property, to a divestment of title, and to compulsory acceptance of the ultimate award, all regardless of whether, personally and voluntarily, it would ever have agreed to the amount thereof. And the proceeding, as remedial to each of its parties, and in the absence of agreement, is the exclusive means of enforcing reciprocal rights, objects, and obligations of both parties therein. Wherefore the remedy itself precludes either the existence, or any solicitude respecting the concurrence, of a so-called right of vendor's lien in the event of nonpayment of the "price." The judgment therein, by its own force, precludes a higher form of security, precludes the existence of anything in the nature of a concurrent equitable right to assert a lien if the award is not paid. Putting it in another way: The condemnation proceeding, and the judgment therein, afford complete protection to either of the parties in the accomplishment of the object sought therein on behalf of either.

In considering the matter in this way, the Filer & Stowell Company and the railroad company, in October, 1907, as respondent and petitioner, respectively, in the condemnation proceedings, had accomplished these two objects: The railroad company had secured by the proceedings the right to the property desired for its railroad purpose, subject to the liability of $115,000, to be paid in cash, and the Filer & Stowell Company had been subjected to the taking of the property involved in the proceeding, and had been awarded the right to receive the sum of $115,000, which right was required to be satisfied before the railway company could have had the benefit of the judgment of taking. The award of $115,000 was, of course, in no sense regarded as a supposed "purchase price" of land taken. As an award of compensation upon a taking, it comprehended the value of the land actually taken, but it also comprehended more. The Filer & Stowell Company, by force of the proceedings themselves, then had the highest form of security which it could possibly get—in a sense, the award—a condition which the railway company was bound, and offered, to meet by payment.

[5] If the parties in their then situation had seen fit by stipulation to provide for an award of $160,000 in the proceedings, manifestly the latter would have retained the self-securing if not self-executing, character herein noted. Petitioners would have been entitled to receive the amount *in cash*, and the railroad company would have to be obliged to pay it before getting the right of way therein comprehended. In the sense that the railroad company from the beginning was trying to get a right of way over the petitioner's lands, these parties may have occupied the position of prospective vendor and vendee. But at the particular time in question they were *parties to a lawsuit*, whose subject-matter was (1) the compulsory taking of lands; and (2) the compulsory fixing of compensation for the damage occasioned by the taking. Now, upon my understanding of eminent domain proceedings (in Wisconsin), the proceedings pending as they were, the first issue, viz. the necessity of taking (and the right actually to enter upon payment of the award) had become fixed and no longer triable de novo. Whether the owner

liked the amount awarded or not, his land was then subject to be taken as to title, possession, and enjoyment upon payment of the award, and in case of an appeal upon giving the statutory assurances for meeting an augmented or different award or judgment. Therefore the appeal from the $115,000 award was effective merely to enable the herein petitioner to reopen and further wage the issue respecting the amount of compensation.

That the parties could not agree upon an increase of the railroad company's liability *to be satisfied* in cash under the rigor of a judgment, or otherwise, is shown, first, by the undisputed testimony; and, secondly, by the agreement entered into. And the latter, by its express terms, stands as the means taken by parties thereto to compose a lawsuit. To just what extent, in the estimation of the parties, particular concessions or recessions to or from the rights and liabilities as determined (or determinable) in the condemnation proceedings, were valuable to them respectively, need not be determined. Nor, were it sought to ascertain the value of any particular change or substitute, would it be possible. So, when the contract concisely provided for openings, for subways, for driveways, spur track, retaining walls, an embankment retaining strip, across and along the proposed right of way, for the expense of their future maintenance by the parties respectively, for the dismantling and conversion to the use of the petitioner of the building, also conveyance of the 150-foot right of way, they made no effort to segregate these subject-matters and to allot a consideration for or against any one in severalty.

[6] It may be that, when deeds for the specific pieces of land were exchanged, the parties did what vendors and vendees ordinarily do—the deeds exhibit grants from a "vendor" to a "vendee." But these parties, in addition to covenanting for these grants, stipulated in the same contract, or as a part thereof, for three additional things: (1) A covenant binding the railroad company to deliver to the petitioner 160 bonds of a specific tenor and carrying security, the latter including the particular interests in land covered by the contract and (as to the right of way) comprehended within the condemnation proceeding; (2) a repurchase of these identical bonds by Frost within two years as specified; (3) for a dismissal of the condemnation proceedings.

Now, everything which these parties respectively agreed to do—at the time and by the contracts in question—has been done. True, Frost did not repurchase the bonds, but the parties stipulated that he should *covenant* to repurchase them, and he did so, and the petitioner received, retained, and now retains, that formal covenant. True, the 160 bonds have not been paid; but the covenant was to deliver them, and they were delivered, accepted, and retained, and are now retained, as the identical subject-matter of the railroad company's covenant.

This extended discussion now prompts the observation that at no time prior to the agreement in question does the relationship between these parties disclose, as fixed by agreement or otherwise any status quo, except the condemnation proceedings. Upon no hypothesis of the evidence can any intermediate agreement, or even concurrence, upon price, reciprocal covenants as to debt or subject-matter of transfer, be found. On the contrary, it may be reiterated, the evidence indubitably repels the possibility of any finding, except that the agreement now here was the only one to which the parties would and did put their hands to supersede their then status as parties litigant. And it is of no small significance that, upon the express stipulation in this contract for a dismissal of the condemnation proceedings, the parties bound themselves and are now bound further by the order or judgment of a court having their status within its jurisdiction.

Therefore, when we seek to apply elementary principles to this record as the parties have made it, with or without a finding of fraud, whether we direct our attention to rescission, to vendor's lien, or to any conceived analogy of either, the conclusion must be the same. Obviously, rescission contemplates a recurrence to something else; and a vendor's lien certainly contemplates a pre-existing status, disclosing a debt in terms of money agreed to be paid, for which, upon default, the lien is sought. Surely the principles of equity, though elastic, are not so vague and indefinite that their very inapplicability is of itself an equity; that when a vendor has disenabled himself from rescinding, or from asserting a vendor's lien, his disability gives rise to a right of lien on general principles. It is my judgment that the moment the contract of October 30, 1907, comprehended the stipulations for a delivery of 160 bonds, for a dismissal of the condemnation proceedings, and for the Frost repurchase con-

tract, the parties bargained repugnantly to the existence of any right of vendor's lien —even assuming (and I do not believe the assumption warranted) that any such right theretofore existed. The very "nature of the transaction," the "manner in which the parties dealt with each other" (see cases), "exempted" the subject-matter of their bargain, and prevented and now prevents the "implication of the right." And manifestly, when the right of rescission is lost, or when the court cannot recognize it because of the inability to restore the parties to a status quo other than of the court's own creation (in the present case a status *refused* by the railroad company when it refused to incur a debt for cash) there is no warrant whatever for any "lien."

This view involves necessarily a rejection as unsound of any suggestion in such cases as Tobey v. McAllister, 9 Wis. 429. It rejects the idea that, where the parties have bargained repugnantly to the existence of the right, a court of equity may, fraud or no fraud, with or without rescission, create a situation out of which it will arouse a lien. And necessarily it rejects the idea that the court in this case may award a lien for fraud, or for the breach of covenants executed in lieu of what would ordinarily be a price in money when the latter was expressly refused, or to convert the lien of the bonds taken by the petitioner into a lien of higher grade. The court is not at liberty, upon promptings of mere expediency, to find a "way to relieve" the petitioner. Graham v. Moffett, 119 Mich. 307, 78 N. W. 132, 75 Am. St. Rep. 393.

The views thus expressed dispense with the necessity of discussing separately the question whether land conveyed to a railway company for right of way may be subjected to a vendor's lien, and, if so, the rank thereof in respect of any existing railway mortgage. The case, as it stands, has been considered as presenting fundamentally the question . whether, upon the evidence, according to the principles · of equity, the petitioner has established any sort of an equitable right. The fact that the petitioner, when it accepted the bonds, knew that they were secured by a mortgage which, by express terms, contemplated the inclusion of the real estate involved in the condemnation proceedings, as well as in the agreement of October 30th, has been recognized as having a pertinent bearing upon determining the question of conduct, or the nature of the transaction between the parties. Nor is it necessary to consider the question whether the petitioner herein, as a holder of bonds, secured by the mortgage foreclosed in this proceeding, was a party to the foreclosure proceedings, so that the decree herein precludes it from asserting any lien whatsoever.

My conclusion is that a judgment should be entered herein dismissing the petition, and that may be done.