**In re MONROE WELL SERVICE, INC. (Jointly administered with Metro Pipe and Supply Co., Inc., No. 86–02013G; Evergreen Oil & Gas, Inc., No. 86–02014G; Tullos Group, Inc., No. 86–02015G; and SSM (A Pennsylvania Partnership) No. 86–02016G, Debtors.**

**Bankruptcy No. 86–02012G.**

United States Bankruptcy Court, E.D. Pennsylvania.

Dec. 2, 1986.

As Amended Dec. 3, 1986.

---

Robert H. Levin, Adelman Lavine Krasny Gold & Levin, Philadelphia, Pa., for debtors, Monroe Well Service, Inc., et al.

Michael A. Bloom, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., for Official Committee of Limited Partnerships.

C. Warren Trainor, Ehmann & VanDenbergh, Philadelphia, Pa., for Official Creditors' Committee.

J. Scott Victor, Melvin Lashner Associates, Philadelphia, Pa., for objectors, James Drilling Co., Inc. and James A. McCoy, Associates.

John Francis Gough, Toll, Ebby & Gough, Philadelphia, Pa., for Enron Oil Trading Transp. Co.

## OPINION

BRUCE FOX, Bankruptcy Judge:

Before me is the debtors' motion to "Compel Further Continuation of Payments." This motion seeks to enjoin creditors from exercising their state created rights against non-debtors and raises issues involving the scope of the bankruptcy court's powers under 11 U.S.C. § 105 to stay the actions of entities who are not subject to 11 U.S.C. § 362. In order to understand the reasons why the debtors have sought to invoke the court's section 105 powers, and why, in my discretion, I am very reluctantly exercising those powers, it is first necessary to set out the

factual and procedural underpinnings of the motion.

## I.

The facts in this matter are in large measure uncontested by the parties. The following summary is derived from testimony and documents provided at hearings held on May 14, 1986, May 22, 1986 and November 18, 1986.

This bankruptcy case began on April 23, 1986, when five related debtors filed voluntary bankruptcy petitions under chapter 11. This court consolidated these five cases for joint administration. All of the debtors are controlled by one individual—Sheldon Somerman; he is the chief executive officer and sole shareholder of the four corporate debtors and he holds the majority interest in the one limited partnership debtor. Somerman's various entities were involved in the oil business in four states—Louisiana, Arkansas, Texas, and Indiana.

For purposes of this motion, the principal debtor is Monroe Well Service, Inc. ("Monroe"). Monroe drills, operates, maintains and services approximately 3,400 oil wells under contract with 101 affiliated limited partnerships which own [1] the vast majority of the wells. Monroe organized investors into limited partnerships which then contracted with Monroe to drill "stripper wells"—wells which produce under 10 barrels of oil per day.[2]

Debtor Metro Pipe and Supply Company, Inc. ("Metro"), is a corporation that provides tools, equipment and supplies to Monroe. The three remaining debtors, Evergreen Oil & Gas ("Evergreen"), Tullos Group, Inc. ("Tullos"), and SSM own approximately 400 "stripper" oil wells between them, the proceeds of which have been assigned to various lending institu-

tions. These last three debtors also have an interest in some of the non-debtor limited partnerships that together own approximately 3,000 such wells; specifically, the three remaining debtors are the general partners in 45 of the limited partnerships which own approximately 60% of the 3,000 wells.

When oil prices declined recently, Monroe was unable to locate investors to form new limited partnerships and was forced to cease its drilling operations. As it was the drilling component of its business which generated 90% of its income, Monroe and its relations were compelled to file for bankruptcy. At the time that the petitions were filed, the debtors were subsisting upon income generated solely from servicing the oil wells for the limited partnerships and lending institutions. During the course of the bankruptcy proceedings, this servicing income was fixed at $450.00 per month per well, yielding income to the debtors of approximately $1.1 million per month which enables them to cover expenses.[3]

Two customary occurrences in the oil business play key roles in evaluating this motion. First, although Monroe was hired to drill oil wells, it contracted and subcontracted different functions to third parties. Various entities or individuals performed surveying tasks, did the actual drilling on some wells, built roads and storage tanks at the well sites, and brought in equipment and machinery. These contractors and materialmen not only became creditors of the various debtors, they also possessed the right under relevant state law to obtain liens upon both the oil and the proceeds of the sale of such oil. Many such liens were filed against some of the 3,400 wells ser-

---

1. It is unclear whether the limited partnerships own only the leasehold, or working interest, on the oil wells, or actually own the mineral rights. In order to resolve this dispute, the distinction is not relevant because the liens in question attach to the working interests as well as the mineral rights. *See In re Energy Contractors, Inc.,* 49 B.R. 139, 140 (Bankr.M.D.La.1985).

2. Here, the wells produce only about 2 barrels per day.

3. Actually, the $450.00 per month charge is a ceiling. If the oil production and income generated by a particular well falls below a certain level, as happens on occasion, the entire service charge is not assessed.

viced by Monroe and these liens total more than $10 million.[4]

Second, the oil produced is initially sold to an entity denoted the "First Purchaser." This purchaser pays for its oil in accordance with a "division order." The division order directs payment for the oil in part to the owner of the mineral rights ("royalty owner") and the balance to the owner of the working interest or leasehold interest. Here, that latter interest in large measure would be held by the limited partnerships or lending institutions. However, the parties agree that creditors with statutory liens against the oil and its proceeds can compel First Purchasers to pay their lien claims ahead of the payments directed by the division orders. *See also Babcock & Thomas, Some Common Issues In Oil and Gas Bankruptcies: A Primer for the Non-Bankruptcy Practitioner*, 46 La.L.Rev. 763, 779–80 & nn. 122, 125 (1986).

Failure of First Purchasers to make payments to in accordance with the division orders would likely cause the following to occur: the working interests in the wells would cease making monthly service payments to Monroe; Monroe would then stop servicing the stripper wells; due to the high saltwater content of these wells, the wells would cease being operational within 30 to 90 days and there would be a substantial cost involved in either reopening the wells or drilling adjacent wells. Testimony was also offered that it would be difficult to obtain a replacement servicer for these wells before the wells suffered significant damage.

## II.

Prior to the debtors' bankruptcy filing, various creditors of the debtors who had provided labor, services or materials in connection with debtors' oil drilling and service operations filed notice of their statutory liens or "privileges." *See* La.Rev.Stat.

§ 9:4861. *See also In re Energy Contractors, Inc.*, 49 B.R. 139 (Bankr.M.D.La. 1985). Notice of these liens was provided to First Purchasers of oil from the various Monroe oil wells which prevented these purchasers from complying with the division orders.[5] Since the proceeds from the sale of oil would ordinarily go to the working interest holders (*i.e.* the banks and limited partnerships), who, in turn, would use those funds to pay Monroe their contractual monthly service charges, these lien creditors were threatening to terminate the last source of income to the debtors.

In May 1986, shortly after they filed bankruptcy, the debtors sought a court order to compel, initially the largest First Purchaser and then, all First Purchasers to comply with the relevant division orders and not to pay any sum to the lien creditors. By orders dated May 14, 1986, May 22, 1986, August 20, 1986, and September 18, 1986, Chief Judge Emil F. Goldhaber granted debtors' request. These orders were opposed by: the largest First Purchaser, Enron Oil Trading Transportation Company (formerly UPG Falco) ("Enron"); the Committee of Unsecured Creditors; and various lien creditors, such as James Drilling Company, Inc. ("James Drilling") and James A. McCoy, Associates ("McCoy"). Appeals from these orders were taken and consolidated before Chief Judge John P. Fullam where they are currently pending.

All of the orders were of limited duration as they were to be temporary measures. On October 20, 1986, I continued the status quo and entered another temporary order similar to the earlier orders. An appeal from this order was also taken and is pending in District Court. However, I also informed all parties that before entering any further orders I would hold another hearing to determine the current status of this

---

**4.** Thus, with respect to the debtors, the creditors hold unsecured claims but the claims are secured, at least in part, by assets owned by non-debtor entities. In this opinion, these creditors will generally be referred to as the "lien creditors."

**5.** The First Purchaser in this case asserts that a purchaser who complies with a division order after receiving notice of a privilege may be liable to the lienholder.

proceeding and to consider whether the factual circumstances had changed since the last hearing held on May 22, 1986.[6]

At the hearing on November 18, 1986, the only objectors to the relief sought by debtors were two lien creditors, James Drilling and McCoy. Of the $10 million in contractors' and materialmen's claims, the combined claims of the two objectors total approximately $800,000.00. The Committee of Unsecured Creditors, which represents the interest of all the lien creditors, including McCoy and James Drilling, supported the debtors' request for the entry of another temporary order as did the Committee of Limited Partnerships. Enron, which had opposed and appealed the entry of the earlier orders, also supported the debtors' position at the November 18, 1986 hearing.

At the conclusion of the November 18, 1986 hearing, I entered an order maintaining the status quo until December 1, 1986 in order to allow sufficient time to evaluate the parties' positions and to prepare a written opinion. For the reasons set forth below, I am granting debtors' motion for another period of limited duration.

### III.

Although the debtors phrase their motion as one to continue to compel payments, the request before me is whether this court should continue restraining creditors of the debtors from enforcing liens against non-estate property in the possession of non-debtor third parties because enforcement of the liens will deprive the debtors of all operating income and destroy any prospects for reorganization.

In ruling on the debtors' motion, I am not writing on a clean slate. By virtue of orders entered by my predecessor, Chief Judge Goldhaber, the lien creditors were

restrained from enforcing their liens for 5 months; I entered an order continuing the restraint for an additional 30 days. After holding another hearing, I believe it now appropriate to consider not only whether the factual circumstances which led Chief Judge Goldhaber to exercise his equitable powers in the first place continue to exist, but also, more fundamentally, whether the court has the power, under the Bankruptcy Code, to issue such an order.

■ The starting point in this case, and a proposition with which all parties agree, is that the enforcement actions of the lien creditors are not restrained by the automatic stay, 11 U.S.C. § 362. The enforcement of the lien creditors' rights to monies in the possession of the First Purchasers is neither an action against the debtor nor an action to obtain possession of property of the estate. *See* 11 U.S.C. § 362(a)(1), (3). The source of the court's power, if any, to impose a stay on the lien creditors must be 11 U.S.C. § 105.

It is also clear that one of the purposes of section 105 is to give the bankruptcy court the power to issue stays or injunctions in situations not encompassed by section 362.

> The court has ample ... powers to stay actions not covered by the automatic stay. Section 105 ... grants the power to issue orders necessary or appropriate to carry out the provisions of title 11. The district court and the bankruptcy court as its adjunct have all the traditional injunctive powers of a court of equity.... Stays or injunctions issued under these other sections will not be automatic upon commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions.... Thus, the court will have to determine

---

**6.** The initial motion filed by Monroe requested an order compelling payments for a 6 month period. Due to the various orders entered by this court, Monroe received the relief for the 6 months requested. As a result, Monroe filed a new motion seeking an order compelling payments for an additional 3 months, which is presently before me. In ruling on that motion,

I am in no way affecting or attempting to affect the earlier orders which are now on appeal. I do, however, have the power to grant plenary consideration to Monroe's present request for, in effect, a new preliminary injunction to replace prior injunctions which have expired by their own terms.

whether a particular action which may be harming the estate should be stayed. S.Rep. No. 95–989, 95th Cong., 2d Sess. 51 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5837; H.Rep. No. 95–595, 95th Cong., 1st Sess. 341 (1977) ("House Report"), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6298; *see Penn Terra Limited v. Department of Environmental Resources, Commonwealth of Pennsylvania,* 733 F.2d 267 (3d Cir.1984).

The large majority of the courts which have considered the question have held that bankruptcy courts have the power to restrain legal action by creditors of the debtor against non-debtor third parties, in certain circumstances, pursuant to 11 U.S.C. § 105. Most courts considering the issue begin their analysis with *In re Otero Mills, Inc.,* 21 B.R. 777 (Bankr.D.N.M.1982), *aff'd,* 25 B.R. 1018 (D.N.M.1982). In *Otero Mills,* the debtor requested an injunction to prevent a creditor from proceeding in state court on a debt guaranteed by the debtor's president and shareholder. The court held that under section 105 it had the power to enjoin actions against non-debtor third parties which would have a detrimental impact on the debtor or the estate. The court enunciated a 3 prong test for determining whether an injunction should issue: (1) irreparable harm to the estate; (2) likelihood of a successful reorganization; and (3) no harm or minimal harm to the other party. 21 B.R. at 778–89. In issuing the injunction, the court appeared to be particularly influenced by the fact that the debtor's president-shareholder intended to contribute to the debtor's estate the same property that the creditor was attempting to reach in the state court proceedings and that the creditor was pressuring the debtor through its collection activities.

Many other courts have exercised their powers under section 105 to restrain creditors of the debtor from proceeding against non-debtor third parties due to the anticipated adverse impact on the bankruptcy estate. In a variety of contexts, the creditor's actions were held significant enough to justify the issuance of an injunction.

As in *Otero Mills,* an injunction may be appropriate when the non-debtor owns assets which will either be a source of funds for the debtor or when the preservation of the non-debtor's credit standing will play a significant role in the debtor's attempt to reorganize. *In re Lahman Manufacturing Co.,* 33 B.R. 681 (Bankr.D. S.D.1983). *See generally Matter of Old Orchard Investment Co.,* 31 B.R. 599 (W.D.Mich.1983); *In re Comark,* 53 B.R. 945 (Bankr.C.D.Cal.1985). In other cases, courts have granted injunctions, at least on a temporary basis, to restrain actions against a principal of the debtor upon a showing that the non-debtor's time, energy and commitment to the debtor are necessary for the formulation of a reorganization plan. *In re Kasual Kreation, Inc.,* 54 B.R. 915 (Bankr.S.D.Fla.1985); *In re Mac-Donald/Associates, Inc.,* 54 B.R. 865 (Bankr.D.R.I.1985); *Matter of Provincetown Boston Airline, Inc.,* 52 B.R. 620 (Bankr.M.D.Fla.1985); *Matter of Rustic Manufacturing, Inc.,* 55 B.R. 25 (Bankr.W. D.Wis.1985); *In re Northlake Building Partners,* 41 B.R. 231 (Bankr.N.D.Ill.1984). In another group of cases, courts have issued injunctions against creditors where the relationship between the non-debtor and debtor is such that a finding of liability against the non-debtor would effectively be imputed to the debtor, to the detriment of the estate. The harm to the estate may occur due to the impact of the doctrine of collateral estoppel. *In re Mac-Donald/Associates; In re Lion Capital Group,* 44 B.R. 690 (Bankr.S.D.N.Y.1984); *In re Johns-Manville,* 26 B.R. 420 (Bankr. S.D.N.Y.1983), *aff'd,* 40 B.R. 219 (S.D.N.Y. 1984). It might also result from the existence of an indemnification agreement between the debtor and the non-debtor. *A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994 (4th Cir.) *cert. denied,* —— U.S. ——, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); *In re Johns-Manville,* 26 B.R. at 429.

There are also a number of cases in which the courts have acknowledged their power to restrain actions against non-debtors but have declined to do so because, as a

factual matter, an inadequate showing of detriment to the bankruptcy estate was made. *In re Kalispell Feed and Grain Supply, Inc.,* 55 B.R. 627 (Bankr.D.Mont. 1985); *In re Forty-Eight Insulations, Inc.,* 54 B.R. 905 (Bankr.N.D.Ill.1985); *In re Anje Jewelry Co.,* 47 B.R. 485 (Bankr.E.D. N.Y.1983); *Mahaffey v. E–C–P of Arizona, Inc.,* 40 B.R. 469 (Bankr.D.Colo.1984); *In re Brookfield Tennis, Inc.,* 29 B.R. 1 (Bankr.E.D.Wis.1982). *See also Dore & Associates Contracting, Inc. v. American Druggists' Insurance Co.,* 54 B.R. 353 (Bankr.W.D.Wis.1985) (section 105 injunction dissolved after 3 years).

Finally, I am aware of those cases which have read section 105 restrictively. These courts have concluded that even when the debtor and non-debtor entities are closely related, the legal distinction between the entities, which have significance in other legal contexts, should be recognized in bankruptcy. Another theme in these cases is that the non-debtor entity should not receive a "free ride," it should "earn" the benefits of a bankruptcy stay by filing its own bankruptcy petition. *See In re Juneau's Builders Center, Inc.,* 57 B.R. 254 (Bankr.M.D.La.1986); *In re O.H. Lewis Co.,* 40 B.R. 531 (Bankr.D.N.H.1984); *In re Venture Properties, Inc.,* 37 B.R. 175 (Bankr.D.N.H.1984).

On balance, after reviewing the caselaw under section 105 and the legislative history surrounding its enactment,[7] I conclude that the majority view, though not without its problems, is the better view. I am not certain that the *Otero Mills* test sets forth any general principle for limiting the scope of section 105. Nevertheless, at least in the context of requests to extend the stay to situations not within the scope of section 362, I am persuaded that the bankruptcy court, as court of equity, has the power to issue injunctions under section 105 to prevent significant harm to the estate in appropriate circumstances.[8]

In following *Otero Mills,* I would, however, rephrase slightly the test for determining whether an injunction would issue to that set forth by the court in *Dore & Associates Contracting Co. v. American Druggists' Insurance Co.* The first requirement is that there be the danger of imminent, irreparable harm to the estate or the debtor's ability to reorganize. Second, there must be a reasonable likelihood of a successful reorganization. Third, the court must balance the relative harm as between the debtor and the creditor who would be

7. The legislative history, though sparse, states that section 105(a) is based upon former section 2a(15) of the Bankruptcy Act and upon the All Writs Statute, 28 U.S.C. § 1651.

Section 105 is derived from section 2a(15) of present law, with two changes. First, the limitations on the power of a bankruptcy judge (powers that were reserved to the district judge) are removed as inconsistent with the separation of the two courts and the increased powers and jurisdiction of the new court.... Second, the bankruptcy judge is prohibited from appointing a receiver in a case under title 11 under any circumstances....

Section 105 is similar in effect to the All Writs Statute, 28 U.S.C. 1651, under which the new bankruptcy courts are brought by an amendment to 28 U.S.C. 451, H.R. 8200 § 213. The section is repeated here for the sake of continuity from current law and ease of reference, and to cover any powers traditionally exercised by a bankruptcy court that are not encompassed by the All Writs Statute. House Report 316–17 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 6273–74.

Under § 2a(15), district courts enjoined non-parties in order to aid the bankrupt in its reorganization plan. *In re Standard Gas and Electric Co.,* 139 F.2d 149 (3d Cir.1943), *cert. denied,* 321 U.S. 796, 64 S.Ct. 848, 88 L.Ed. 1085 (1944). Moreover, non-parties have been enjoined under the All Writs Statute in appropriate circumstances. *See Application of the United States of America,* 610 F.2d 1148 (3d Cir.1979); *United States v. State of Washington,* 459 F.Supp. 1020, 1116 (W.D.Wash. 1978), *aff'd,* 645 F.2d 749 (9th Cir.1981).

8. I am mindful of the warning that section 105(a) "does not authorize the bankruptcy court to create rights not otherwise available under applicable law." *Southern Railway Co. v. Johnson Bronze Co.,* 758 F.2d 137, 141 (3d Cir. 1985). However, utilizing section 105(a) to fill the gaps left by section 362(a), in appropriate circumstances, is not comparable to establishing claim priorities different from these clearly set forth in the Code, as was involved in *Southern Railway.*

restrained. Fourth, the court must consider the public interest; this requires a balancing of the public interest in successful bankruptcy reorganizations with other competing societal interests. 54 B.R. at 357–59.

## IV.

James Drilling and McCoy, the objecting lien creditors, assert that it is beyond this court's jurisdiction to issue the injunction sought by debtors. In 28 U.S.C. § 1334(a) and (b), Congress has granted to the district court jurisdiction over "all cases under title 11" and over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." As an adjunct of the district court, and with its consent, this bankruptcy court can determine, in some fashion, all proceedings falling within this broad jurisdictional grant. *See* 28 U.S.C. § 157.

To the extent that the lien creditors contend that the jurisdiction of the court does not reach proceedings involving non-estate funds held by third parties and claimed by creditors, I must reject this argument as being based upon an outmoded view of bankruptcy court jurisdiction.

■ Under the former Bankruptcy Act, jurisdiction was based on actual or constructive possession of estate property. In short, the court's jurisdiction was *in rem.* Under the Bankruptcy Code, the jurisdictional mandate is far broader. It is not limited to property within the debtor's estate. *See In re Lion Capital Group,* 44 B.R. at 701; 1 Collier on Bankruptcy ¶ 3.01, at 3–10 to 3–12 (15th ed. 1986); House Report 445, *reprinted in* 1978 U.S.Code Cong. & Ad.News 6400 ("The idea of possession or consent as the sole bases of jurisdiction is eliminated."). Therefore, there is no threshold requirement, as the objecting lien creditors contend, that estate property be involved before the court may exercise its section 105 powers.

More difficult is the interplay between 11 U.S.C. § 105(a) and the jurisdictional grant set forth in 28 U.S.C. § 1334. The phrase "arising under" was borrowed from the federal question jurisdictional grant found in 28 U.S.C. § 1331. In the bankruptcy context, it was the congressional intent to empower bankruptcy courts to hear "any matter under which a claim is made under a provision of title 11." House Report 445, *reprinted in* 1978 U.S.Code Cong. & Ad. News 6400. *See generally* 1 *Collier on Bankruptcy, supra,* ¶ 3.01 [iii]. The phrase "related to" has been defined in this circuit as follows:

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.... Thus, the proceeding need not necessarily be against the debtor or against the debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankruptcy estate.

*Pacor v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984) (citations omitted).

■ Given the impact upon the debtors which would follow if the lien creditors were allowed to exercise their state created rights against the First Purchasers, there can be little doubt that this matter is "related" to the bankruptcy within the meaning of § 1334(b). It is probably also an "arising under" proceeding in that the sole authority for the debtors' request is found in the Bankruptcy Code itself, 11 U.S.C. § 105(a).[9]

The objectors fear that permitting section 105(a), which is open ended, to define the reach of bankruptcy court jurisdiction invests more power in this article I court

---

**9.** Moreover, even if a proceeding in which a section 105 injunction is sought is not a cause of action which "arises under" title 11, it would be a proceeding "arising in" title 11. *See* 1 Collier, *supra* ¶ 3.01, at 3–27 to 3–28. *See generally Matter of Rustic Manufacturing, Inc.,* 55 B.R. at 29–30.

than either Congress intended or the Constitution permits. To some extent this overlooks the limiting principle established by the *Pacor* definition of "related." This fear also confuses the issue of lack of subject matter jurisdiction with the failure to state a claim. Debtors seeking a bankruptcy court injunction to prevent creditor action against third parties may well not be entitled to the requested relief in a given case. But the denial of such relief stems not from the court's lack of authority to act but rather from limitations upon the historic exercise of the court's equitable discretion. *See In re Lion Capital Group*, 44 B.R. at 701. It is understandable why there is some confusion in this area. One of the standards for the issuance of a section 105 injunction to restrain action against a non-debtor third party is the requirement that, absent the injunction, the estate will be adversely and materially affected. The exercise of jurisdiction under 28 U.S.C. § 1334(b) also inherently requires a nexus to the debtor's estate. Thus, it is not surprising that a court which is not persuaded that the creditor's action against the non-debtor will affect the estate might couch its decision in terms of lack of jurisdiction. *See In re Dickenson Lines, Inc.*, 47 B.R. 653 (Bankr.D.Minn.1985). Similarly, the less "related" the affected non-debtors are to the debtor, the less likely a court may be to issue an injunction under the traditional balancing tests employed by courts of equity. However, in both situations, it is more accurate to analyze such a case in terms of the failure to state a cause of action rather than lack of jurisdiction.

The objecting lien creditors also contend that even if there is federal court jurisdiction, this matter is a related proceeding and the bankruptcy court may only issue proposed findings of fact and conclusions of law. Again, I do not agree.

This argument is premised on a misunderstanding of the function of the core/related proceeding dichotomy established by Congress in 28 U.S.C. § 157(b) in

response to the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). As one court has explained:

> The purpose behind the core proceedings classification in the 1984 bankruptcy Amendments is to distinguish between those matters in which bankruptcy judges can exercise broad discretion, *i.e.*, in the adjudication of federally created rights, and those matters in which they can exercise only limited discretion, *i.e.*, state created rights.... [The debtor] is requesting this court to enjoin [a creditor] from enforcing its contract rights against the guarantors in state court. In one respect this involves state-created rights in that state law created the rights arising under the guarantees. However, this court is not determining the validity of these guaranties, it is determining only whether an injunction should issue against [the creditor].... [The debtor] is asking this court to issue an injunction pursuant to its powers under 11 U.S.C. § 105(a). Therefore, the action involves rights arising under a federal statute which authorizes the exercise the equity founded primarily on the federal bankruptcy laws.

*Matter of Rustic Manufacturing, Inc.*, 55 B.R. at 28–29.

■ Based on the analysis quoted above, with which I agree, the *Rustic Manufacturing* court held that an action for an injunction under section 105 is a core proceeding under 28 U.S.C. § 157(b). *Accord, In re Johns-Mansville*, 801 F.2d 60 (2d Cir.1986); *In re HBG Servicenter, Inc.*, 45 B.R. 668 (Bankr.E.D.N.Y.1985).[10] On this authority, I hold that this action is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## V.

■ Believing that I have the authority to restrain the objecting lien creditors, I now conclude that I should exercise that authority based upon the factors enumerat-

---

**10.** To the extent the dictum in *In re Energy Contractors, Inc.*, 49 B.R. 139, 140–141 n. 4

(Bankr.M.D.La.1985) is to the contrary, I decline to follow it.

ed in *Dore v. Associates Contracting Co. v. American Druggists' Ins.*, 54 B.R. 353 (Bankr.W.D.Wis.1985).

First, based upon the record before me, I find that the failure to restrain the lien creditors from proceeding against the First Purchasers would result in irrepable harm to the debtors' ability to reorganize. If funds are not paid to the working interests, no monthly service payments would be made, causing the debtors to cease operations, which would close and probably damage the wells. Were this to occur, reorganization would not be possible. *See In re Lahman Manufacturing Co., Inc.*, 33 B.R. 681 (Bankr.D.S.D.1983) (injunction in favor of third party who was providing the sole source of funding for reorganization).

Second, at the present time there appears to be a reasonable likelihood of a successful reorganization. Since May 1986, the debtors have increased oil production, rehired former employees, increased their service charges and have earned more income (in part due to a slightly higher price for oil). I also note that the debtors have filed a plan of reorganization supported, and funded, by the various limited partnerships.[11] Virtually all interested parties, including the vast majority of lien creditors, support the debtors' motion.

I recognize, as the objecting creditors note, that the likelihood of a successful reorganization may be dependent upon an increase in oil prices and there is no evidence in the record from which I can divine future oil prices. However, at this early point in the reorganization proceedings of a complex bankruptcy with a plan of reorganization already proposed and with virtually all interested parties believing that a reasonable possibility of reorganization exists, I cannot conclude otherwise. *See Dore & Associates Contracting Co.*, 54 B.R. at 359 (uncertainties should be re-

solved in the debtors' favor early in the bankruptcy case).

Third, a comparison of the relative harm between the debtor and the objecting creditors leads me to support the injunction sought here. I have already concluded that if the relief sought is not granted, the prospects for reorganization are nil, which adversely and significantly affects the debtors, their creditors, the limited partnerships, and the financial institutions. In comparison, enjoining the objecting lien creditors will have a much less significant consequence.

The effect of the injunction sought will prevent, short term, the lien creditors' attachment of oil sale proceeds in the hands of First Purchasers. Had those proceeds been attached, there would have been some benefit to the objecting creditors, though the record does not reflect the dollar amount of that benefit. To the extent all lien claims were not paid from the sale proceeds and the wells ceased production, the lien creditors would then be forced to take over the working interests of the wells pursuant to state court proceedings, and either operate the wells or hire someone to do so.

The relief sought here does not significantly affect the rights of the objecting lien creditors. After a limited period of delay, the lien creditors will still have the right to proceed against the leasehold interests. Debtors' geologist testified that only 2% of the oil reserves have been depleted between May and December 1986 and the objectors offered no contrary evidence. Thus, if the objectors are ultimately compelled to take over the oil wells, the injunction will result in no material difference in their ability to run the wells in order to collect their claims. The objecting creditors can also attach, in the future, the proceeds from the sale of oil held by First Purchasers.[12] In short, I see no impact on

11. The court was also advised that an amended plan would be filed shortly which would be sponsored also by the Committee of Unsecured Creditors. As explained earlier, among the creditors represented by this committee are the

two objecting creditors to this Motion. *See* note 4, *supra*.

12. One further point by the objectors should be addressed. They correctly note that on May 22, 1986 this court approved an alteration in pay-

the lien creditors other than a delay, of limited duration, in the enforcement of their rights. On balance, then, the equities weigh in favor of the relief sought by the debtors.

Moreover, I will continue to order that the lien creditors be granted replacement liens in the future oil sale proceeds. While the use of replacement liens to protect the rights of creditors is statutorily approved, 11 U.S.C. § 361(2), the objecting lien creditors, James Drilling and McCoy, challenge the power of this court to grant a replacement lien on non-estate property. It appears to me that at least Louisiana law already grants to lien creditors a lien in sale proceeds until the claims are paid in full and so this grant may be superfluous. See, e.g., Hardware Supply and Hardware Co., Inc. v. Humphrey Brothers, 209 La. 979, 26 So.2d 8 (1946). However to the extent this court is interfering with state created rights, I wish to make clear, by way of replacement liens, that the interference is one of delay only. Whether I have the power to impose such liens on non-estate property is a question I need not reach because the limited partnerships and the financial institutions, both of whom hold the leasehold interests, are supporting the debtors' motion and are requesting that I continue the status quo which includes the replacement liens.

"The last factor, 'public interest,' requires a balancing of the public interest in successful bankruptcy reorganizations with other competing social interests." Dore & Associates Contracting Co., 54 B.R. at 359. While I recognize that a creation of a statutory "privilege" represents the embodiment of a state policy to insure payment to suppliers of material and labor in connection with oil well construction, see Babcock & Thomas, supra, at 782, that policy is not significantly different from other types of statutory liens, such as materialmen's liens, which may be affected by bankruptcy proceedings. See 11 U.S.C. § 545. Nor does the policy materially differ from the general protection the states afford to property rights created by contract, such as exists in those cases in which, prior to bankruptcy, a creditor of the bankruptcy debtor seeks to protect itself by requiring a contractual guarantee from a corporate officer as a condition of doing business with the debtor. The state policy, which is being delayed in effectuation only, must compete against the policy implication of denying the requested relief. Here, not only would reorganization fail, with all that entails, but 200 employees would become unemployed, the lien creditors are likely to begin a competitive race in a variety of forums to enforce their liens and the limited partnerships, in turn, may be forced to seek bankruptcy protection in different courts. In comparison to this scenario, virtually all of the parties in interest, aided by the intervention of this court in maintaining the operation of the debtors and by the exercise of jurisdiction in one forum, have attempted to work cooperatively and to negotiate a plan acceptable to the diverse interests. Their progress in this regard has been palpable and consistent with the Bankruptcy Code's policy of promoting an orderly, equitable resolution of creditors' claims. The interest of the few objecting lien creditors, at least where, as in this case, they are only being delayed from enforcing their liens and where their interests are adequately protected in the

ment method used by First Purchasers so that sale proceeds are paid weekly rather than monthly. The result of this change is to lessen the amount of proceeds in the hands of First Purchasers which, in turn, lessens the value of any future attachment of the oil proceeds. It is difficult to quantify the effect of this change upon the objectors because it is unclear how much of the sale proceeds would be available to the objecting lien creditors as opposed to other statutory lien creditors or financial institutions. Furthermore, the debtors have increased their oil output which, in addition to higher prices, increases the amount of the sale proceeds. To minimize this adverse consequence, an escrow fund has been established for the benefit of lien creditors which is increasing weekly and now exceeds $90,000.00. In order to protect the rights of lien creditors, I am willing, if a party in interest requests and upon notice and hearing, to reconsider the size of the payments to the escrow fund and the requirement of weekly rather than monthly payments.

meantime, do not override the strong bankruptcy policies which favor the exercise of the court's section 105 powers.[13]

In conclusion, after considering the competing interests, I conclude that the debtors' request, supported by various committees, is meritorious.

## VI.

Finally, I wish to make two observations concerning the terms of the order that will be entered.

First, I will accept the recommendation of the various committees and limit the duration of the order to 30 days from the date of the last hearing rather than the 90 days requested by the debtors. It is my impression that the progress toward preparation of a plan which has occurred is attributable, in large part, due to the court's close supervision of this case. My willingness to continue to exercise the court's section 105 powers will be influenced greatly by the success or failure of the parties in maintaining their progress toward reorganization. It is therefore appropriate that the order be strictly limited in duration.

Second, despite having given some consideration to modification of some of the terms of the order as they relate to the treatment of First Purchasers, I have decided not to do so. As explained earlier, I perceive the debtors' motion as a request to restrain the lien creditors' enforcement of their lien rights. If the lien creditors are so restrained, it would seem to follow that the First Purchasers, now free of the state law attachment, would simply follow the ordinary terms of the applicable division orders. When viewed in this perspective, it should be unnecessary to "order" the First Purchasers to comply with their contractual obligations to the working interest owners (and their assignees).

For a number of reasons, though, I will not alter the previous orders. The parties have all labored under these orders for 6 months and presumably have developed certain expectations in their dealings with each other. A change in the order may create uncertainty or erroneously suggest that the court intends to alter the status quo; I am hesitant to change an order that appears to be succeeding in accomplishing its intended result. Also, the leading First Purchaser, Enron, now supports the entry of the order in its prior form, which includes certain modifications of the timing and manner of payments by First Purchasers.

An order consistent with this opinion [14] is being entered.

13. Public policy also would not favor a result in which the objecting lien creditors exercise greater rights than they would have in rejecting a proposed plan of reorganization. To allow the objectors in this case to enforce their lien rights would shut down the debtors and prevent any possibility of reorganization, i.e., it would effectively be a veto of any plan of reorganization. The Code, however, has specific provisions which limit a creditor's right to prevent confir-

mation of a plan. See 11 U.S.C. § 1129. So long as the objectors' interests are adequately protected, I see no reason to allow them to accomplish in one guise what the Code would otherwise prevent.

14. This opinion constitutes the court's findings of fact and conclusions of law pursuant to Bankruptcy Rules 9014 and 7052.