In the Matter of ENVIRONMENTAL WASTE CONTROL, INC., d/b/a Four County Landfill, Inc., Debtor.

No. S90–561 (RLM).

United States District Court, N.D. Indiana, South Bend Division.

March 29, 1991.

Henry A. Efroymson, Indianapolis, Ind., for debtor.

Robert H. Oakley, U.S. Dept. of Justice, Washington, D.C., Thomas Candow Jacobs, U.S. E.P.A., Chicago, Ill., for creditor # 1.

John C. Hamilton, South Bend, Ind., for creditor # 2.

Alexander Edgar, South Bend, Ind., for creditor # 3.

Michael Shaefer, Deputy Atty. Gen., Indianapolis, Ind., on behalf of Ind. Dept. of Environmental Management.

James M. Matthews, South Bend, Ind., for creditor Resources Unlimited, Inc.

MEMORANDUM AND ORDER

MILLER, District Judge.

This cause is before the court following withdrawal of reference to the bankruptcy court of two motions. In one motion, debtor-in-possession Environmental Waste Control, Inc., d/b/a Four County Landfill ("EWC"), seeks a determination of the propriety of its payment of groundwater monitoring and related expenses. In the other, EWC seeks a determination of the payment of other corrective action expenses. Through both motions, EWC seeks to fore-

close or delay federal and state governmental authorities from enforcing its legal obligations resulting from environmental litigation in this court.

The obligations at issue arise from this court's judgment in a suit against EWC under the Resource Conservation and Recovery Act ("RCRA"), *United States v. Environmental Waste Control*, 710 F.Supp. 1172 (N.D.Ind.1989), which judgment was affirmed on appeal, 917 F.2d 327 (7th Cir.1990). The dwindling assets that would be used to pay for these obligations are subject to the secured claims of creditor Resources Unlimited, Inc. ("RUI").

This court held an evidentiary hearing on the debtor's motion on February 27, 1991 and heard argument from the parties on March 12, 1991. For those reasons stated below, the court now declines to grant the debtor's requested relief.

## I.

EWC filed its Chapter 11 petition shortly after the decree was entered in the RCRA case. At the time of filing of the bankruptcy case, EWC had slightly more than $2 million in cash. It now has approximately $400,000.00. The balance of the funds has been spent on studies required by the corrective action portion of the RCRA decree, limited salaries allowed by the bankruptcy court, wages paid to a bookkeeper and workers at the landfill, consultant fees, equipment, leachate treatment, and attorney fees. Workers at the landfill have collected leachate, controlled erosion, maintained the site's integrity, and on one occasion removed silt from the main drainage control basin.

The Indiana Department of Environmental Management ("IDEM") is pressing EWC to begin implementation of an extensive groundwater monitoring system that entails installation of new monitoring wells and testing requirements. IDEM sought implementation by October 26, 1990, but the bankruptcy court stayed implementation. The United States Environmental Protection Agency ("EPA") is pressing EWC to commence implementation of a revised Resource Conservation and Recovery Act Facility Investigation work plan; the EPA agreed to forego pursuit of enforcement of that work plan pending resolution of the motions now before the court. EWC presented testimony that the IDEM and EPA plans, while not incompatible, are not wholly consistent, either. EWC contends, and no other parties seem to dispute, that it will run out of money before completing either of these tasks sought by environmental authorities.

The landfill contains deposits of hazardous waste. No shipments of waste have been received during the bankruptcy; the RCRA decree forbade such operation. Accordingly, the landfill has no income apart from accounts receivable, an anticipated $500,000.00 tax refund, and the $400,000.00 cash on hand. EWC has petitioned the United States Supreme Court for certiorari in the RCRA case, hoping to overturn the injunction against its operation of the landfill. If the Supreme Court grants no relief, EWC will run out of money at some point.

EWC pins its future hopes on the Supreme Court and, alternatively, upon a group of potentially responsible parties ("PRPs") from whom EWC is seeking financial contribution. A law firm was retained in September, 1990 to organize those efforts. One of the attorneys handling those efforts, John Houlihan, testified that about one hundred companies were represented at the first meeting of PRPs, on December 18, and they agreed in principle to investigate group funding of the voluntary closure of the landfill. Interested companies were to contribute $300.00 to an administrative fund. A second meeting was held with a smaller group on January 21, and an *ad hoc* steering committee was formed to contact the EPA and decide whether the group would go forward and, if so, how. The PRPs seek the sort of protection against liability that is available under CERCLA, 42 U.S.C. § 9607, but is not as easily available under RCRA.

The meeting with the EPA, intended to make an initial contact to "feel out" the EPA's position on voluntary, group-funded closure, occurred in mid–February. The EPA asked for a written proposal; the

PRPs submitted a proposal the following week and await the EPA's response. Mr. Houlihan testified that if the EPA is "responsive", negotiation will continue with EPA to decide what remedial actions will be taken at the landfill. He reported that timing depends on the speed of the EPA response. Mr. Houlihan said his perception, as "an optimistic guess", was that there may have been enough negotiation to produce an "agreement in principle" in the next sixty to ninety days. At this point, however, no PRPs have agreed to go forward, and more time would be required to work out details after reaching an agreement in principle.

Mr. Houlihan testified that the PRPs would be more reticent to proceed in the face of a mandatory corrective action plan, because their voluntary closure plan might differ and repetitive testing might ensue, with concomitant cost. Any inability of PRPs to take advantage of work performed under RCRA would constitute a disincentive to the PRPs, although if the work did not have to be repeated, it might constitute an advantage to the PRPs for work to be paid for by someone other than the PRPs.

There is no question but that hazardous wastes have contaminated the groundwater beneath the landfill. The court so found in the RCRA suit, and evidence made available since that time indicates that the contamination was far greater than was known then:

—Benzene, a known human carcinogen which is assigned a maximum contaminant level for safe drinking water ("MCL") of 5 parts per billion ("ppb") under the Safe Drinking Water Act, has been detected in concentrations as high as 4.6 million ppb; the series of samples submitted by the EPA, representing samples taken from November, 1988 to February, 1990, disclosed benzene concentrations averaging nearly 415,000 ppb; the mean reading in the admittedly selective series was 17,000 ppb, which is 3,400 times the MCL.

—Carbon tetrachloride, with an MCL of 5 ppb, has been detected in concentra-

tions as high as 18,000,000. The series of samples submitted by the EPA disclosed concentrations of carbon tetrachloride averaging nearly 1,785,000 ppb; the mean reading was 44,000 ppb, which is 8,800 times the MCL.

—1,2 dichloroethane, with an MCL of 5 ppb, has been detected in concentrations as high as 8,000,000. The samples submitted by the EPA disclosed an average concentration of nearly 462,000 ppb, and a mean reading of 11,500, which is 2,310 times the MCL.

—Trichloroethene, with an MCL of 5 ppb, has been detected in concentrations as high as 44 ppb. The samples submitted by the EPA disclosed an average concentration of 36 ppb, and a mean reading of 38, which is 7.6 times the MCL.

In addition, IDEM has submitted evidence that leaks have developed in some of the liners used to prevent the escape of hazardous waste constituents from the cells in which they were placed; EWC's president testified that at one time EWC was pumping 800 to 1,500 gallons of leachate a day from the area of well 34A.

Significant evidence also exists that the contamination has spread beyond the site through migration in the groundwater: chromium and 1,2 dichloroethane, which was found in very high concentrations on the landfill site, were detected in ground water at the Kings Lake Baptist Church and perhaps at a farm owned by Henry Ivy. EWC contests the allegation that contamination has spread off site, arguing the insufficient data supports that conclusion.

The insufficiency of the data is a theme that has long echoed about the landfill. Following the RCRA trial, the court noted the inadequacy of the knowledge EWC had acquired of the ground water beneath its site:

The design, construction, and depth of their groundwater monitoring wells have prevented EWC and its consultants from learning the extent and permeability of the uppermost aquifer, which precludes confident assessment of the groundwater flow's horizontal and vertical direction

and velocity. One cannot design a meaningful groundwater monitoring system without knowing the location of the uppermost aquifer and the direction of the groundwater flow. EWC has not acquired that knowledge.

710 F.Supp. at 1222.

At trial, Dr. Tracy convincingly illustrated this point by overlaying several of the potentiometric maps offered by EWC's consultants; when overlain, those maps depicted groundwater flowing in different, and even opposite, directions. A geological study by the Department of the Interior concluded that, "On the basis of available information, no direction of horizontal flow in the till unit can be ruled out."

710 F.Supp. at 1225.

EWC bears the responsibility for generating the data necessary to evaluate the likelihood that the landfill is the source of any off-site contamination; the EPA work plan would require such investigation as a prelude to actual clean-up. It is difficult to accept an argument that, in the end, posits that investigation should be deferred because there is insufficient present data.

## II.

As a Chapter 11 debtor with assets insufficient to pay its financial and legal obligations, EWC seeks to defer the IDEM and the EPA from forcing it to meet environmental obligations. EWC asks this court for a determination that the environmental authorities have no immediate right to funds in the debtor's estate. In essence, EWC asks this court to maintain the status quo, deferring any distribution of assets until the bankruptcy court determines the rights of EWC's various creditors and/or PRPs become involved in environmental cleanup and corrective action at the landfill.

EWC posits several arguments in favor of its position. Generally, EWC points out that any use of its dwindling assets toward environmental cleanup and corrective action would be useless at this point since EWC lacks the financial resources to complete that action. EWC further suggests that another creditor, RUI, may have priority over the state and federal environmental authorities to EWC's assets. EWC also claims that the landfill presents no imminent environmental danger, particularly since there is no evidence of off-site contamination.

Citing 11 U.S.C. § 363(c)(2), EWC notes that a Chapter 11 debtor may not draw upon a secured creditor's cash collateral without the consent of that creditor or the court. The debtor points out that RUI's secured interest in EWC's estate prevents the EPA and IDEM from drawing on those funds for environmental action. Moreover, EWC argues that this court has the authority under 11 U.S.C. § 105 to enjoin IDEM and EPA from forcing environmental compliance and that such a course is legally justified in this case. EWC generally contends that this court has the equitable power to impose whatever relief is appropriate for the protection of all interests in the debtor's estate.

RUI objects to the use of estate assets to finance environmental monitoring or corrective action at the landfill. RUI argues that it has a secured claim to the estate's assets, which was properly filed with the bankruptcy court and to which there has been no objection, and that its claim has priority over the EPA and IDEM claims for environmental action. RUI cites 11 U.S.C. §§ 503(b), 507, and 363 and argues that under sections 503(b) and 507, environmental cleanup costs at best are afforded the status of administrative expenses of a bankruptcy estate and are subordinate to claims of a secured creditor. Moreover, RUI asserts that EWC cannot provide it with "adequate protection", as required under § 363, before depleting a secured creditor's assets in a bankruptcy estate. RUI contends that it would be inequitable to impose the costs of environmental cleanup on a secured creditor that has no responsibility for the estate's legal liability.

The EPA generally contends that the law does not warrant the relief EWC requests. Specifically, the EPA notes that bankruptcy law requires EWC to comply with all applicable laws and court orders, regard-

less of their effect on the estate's assets. The EPA argues that the law on this issue is clear, particularly given the imminent environmental danger at the landfill and the uncertainty that the debtor will be able to obtain financing from PRPs for corrective action in the future. The EPA refers the court to 11 U.S.C. § 362(b)(4) and (5), which exclude from the automatic stay in bankruptcy proceedings those governmental actions pursued in enforcement of policy or regulatory powers. Additionally, the EPA points out that under 28 U.S.C. § 959(b), a debtor may not manage property in its possession in violation of law. Finally, the EPA argues that existing evidence supports the need for immediate corrective action at the landfill; available evidence suggests both off-site contamination and on-site contamination at high levels.

The IDEM's position mirrors that of the EPA to a large extent, and reinforces the evidentiary assertion that the environmental dangers at the landfill warrant immediate environmental cleanup and corrective action.

Supporters to Oppose Pollution ("STOP") was an intervening-plaintiff in the original RCRA action before this court. STOP has been involved in monitoring EWC's bankruptcy proceedings, including those motions now before this court, and in pursuing actions against PRPs of the landfill. STOP contends that the costs of environmental action at the landfill should be considered an administrative expense with a priority over the claim of RUI. STOP argues that RUI itself is a PRP of the landfill and its claims therefore should not have priority over environmental expenses. STOP also takes many of the EPA's and IDEM's positions on EWC's motions.

### III.

The law generally supports the positions of the environmental authorities and STOP. EWC must proceed with environmental cleanup and corrective action at the landfill as a matter of law, notwithstanding the resulting financial burden.

Resolution of the legal issues in EWC's motions is directed by *Midlantic National Bank v. New Jersey Dept. of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986). In that case, the Supreme Court held that bankruptcy law would not allow a trustee in bankruptcy to abandon property in violation of state and local laws designed to protect health and safety. *See* 11 U.S.C. § 554(a); *In re Peerless Plating*, 70 B.R. 943 (Bkrtcy.W.D. Mich.1987). In *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the Court extended the *Midlantic* holding to cases in which environmental laws specifically are at issue, finding that anyone in possession of a site, whether a bankruptcy trustee or anyone else, "may not maintain a nuisance, pollute the water of the state, or refuse to remove the source of such conditions." 469 U.S. at 285, 105 S.Ct. at 711.

Courts have applied the principles of *Midlantic* and *Kovacs* to instances somewhat analogous to the one before this court. The Sixth Circuit has held that a bankruptcy trustee cannot both abandon assets in contravention of a State's environmental laws or maintain and possess an estate in continuing violation of those laws. *In re Wall Tube & Metal Products Co.*, 831 F.2d 118, 122 (6th Cir.1987). Similarly, in *In re Commonwealth Oil Refining Co.*, 805 F.2d 1175 (5th Cir.1986), *cert. denied*, 483 U.S. 1005, 107 S.Ct. 3228, 97 L.Ed.2d 734 (1987), the Fifth Circuit held that pursuant to 28 U.S.C. § 959(b), a trustee must manage and operate the estate's property according to law, as the owner would be required to do.

EWC argues that none of these cases is directly on point with the issue in this case; the court generally agrees. This case presents no issue of an automatic stay, such as the one before the Fifth Circuit in *Commonwealth Oil Refining Co.* However, the established case law is clear that a bankruptcy trustee or debtor in bankruptcy is obligated to comply with environmental laws, particularly in regards to property in its possession. EWC's legal duty was established in the RCRA case. The law requires the debtor to take action

to fulfill that obligation, regardless of its financial situation. 28 U.S.C. § 959.

The EPA and IDEM have demonstrated beyond question that the groundwater beneath the landfill contains contaminants in spectacularly high concentrations. The EPA and IDEM have also demonstrated a significant likelihood that those contaminants have migrated to human drinking wells outside the landfill, although in much lesser concentrations to date. While EWC claims that there is no evidence of off-site contamination, the landfill lacks the proper groundwater monitoring facilities to determine accurately the extent of any migrant contamination. The corrective action plans ordered by this court and by the IDEM are more than warranted.

The EWC contends that this court has the authority, as a bankruptcy court, to issue whatever equitable relief is appropriate in this case. However, none of the alternative avenues for relief proposed by the debtor would meet either EWC's legal obligations or satisfy all creditors as an equitable solution.

The proposed alternative to corrective action, hopeful waiting for the PRPs, is an unsatisfactory alternative. The situation might differ if a PRP package were in place for immediate implementation, but such an arrangement, if it is to happen at all, is months, indeed perhaps years, away. Although EWC's studies to date do not allow a confident statement as to the rate or direction of the groundwater flow, the contaminant-laden groundwater is moving beneath the landfill. To order the debtor to use its remaining assets toward corrective action is within this court's power; to stem the flow of groundwater beneath the landfill is not. An imminent danger has been shown.

EWC also has asked this court to consider issuing an injunction prohibiting the EPA and IDEM from forcing its compliance with environmental laws. In this case, however, an injunction is not warranted.

Pursuant to Section 105 of the Bankruptcy Code, this court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." While that section gives this court the authority to issue equitable relief in this matter, the EWC has not made the showings required to support an injunction.

To qualify for injunctive relief under 11 U.S.C. § 105, the movant must show: (1) irreparable harm to the estate; (2) likelihood of a successful reorganization; (3) no harm or minimal harm to the other party; and (4) a balancing of the public interest. *Southern Monorail Co. v. Robins and Meyers, Inc.*, 666 F.2d 185 (5th Cir.1982); *In re Monroe Well Service, Inc.*, 67 B.R. 746 (Bkrtcy.E.D.Pa.1986); *In re Otero Mills, Inc.*, 21 B.R. 777 (Bkrtcy.D.N.M.), *aff'd*, 25 B.R. 1018 (D.N.M.1982). While the EWC may have met its showing on the first element by demonstrating that the estate's funds will be entirely depleted if it is required to begin environmental corrective action, it has failed to satisfy the other elements necessary for the issuance of injunctive relief.

A reasonable likelihood of successful reorganization has not been shown. EWC states that it hopes to reopen the landfill and that reopening may be its only means through which reorganization may be achieved. However, the landfill was permanently closed as a result of this court's ruling in the RCRA case. The closure was affirmed by the Seventh Circuit. EWC's sole hope of reopening appears to lie with its writ of certiorari to the United States Supreme Court. This hope does not demonstrate a strong likelihood that EWC will be able to reorganize by reopening the landfill.

The balance of harms counsels denial of the injunction. The EPA and IDEM would suffer substantial harm by an injunction in the delay in corrective action as the groundwater moves inexorably beneath and beyond the landfill. STOP and the citizens which it represents (particularly area residents) also would suffer significant, and perhaps irreparable, harm as the contamination at the landfill spreads.

Finally, the public interest would be disserved by any further delay in corrective action at the landfill. More than two years

has passed since the decision in the RCRA case and little has been done by EWC to meet its environmental obligations. While EWC may never have the financial ability to complete the environmental cleanup process, the public interest dictates that it at least begin that process without delay.

EWC generally argues that to pour the remaining assets into the corrective action plans will accomplish little because the assets will be exhausted before corrective action can be completed. Perhaps the assets will indeed prove to be inadequate, but it appears likely that the alternative is to allow the assets to be exhausted on matters other than the corrective action plan.

In the two years since EWC filed its Chapter 11 petition, its cash has been depleted by eighty percent. Based on EWC's recent financial history, even a delay of several months could reduce the remaining assets significantly. By the time any PRPs eventually agree to assist with the corrective action, the EWC may have no financial ability to begin that process. If the landfill operator contributes no financial backing to the environmental cleanup process, it seems unlikely that the PRPs will be overly eager to take on that entire responsibility themselves.

While EWC has taken the position that the status quo must be maintained and the estate's assets preserved, RUI argues that it has a priority right to the estate's assets, over and regardless of EWC's environmental obligations. In light of the circumstances of this case, RUI's position regarding its priority over the estate's assets must yield in light of the competing environmental harms.

Absent the imminent danger disclosed by the EPA and IDEM, RUI's position, asserting absolute priority, would be stronger. 11 U.S.C. § 363(c)(2), however, allows the use of the debtor's property for purposes such as environmental clean-up despite the claims of secured creditors, upon order of the court after notice and hearing. Notice has been given and hearing has been held; the court is persuaded that the facts and authorities recited above compel implementation of the corrective action programs.

RUI further contends that for the court to order EWC's environmental compliance is to deprive it of property rights without just compensation, citing *In re George Ruggiere Chrysler–Plymouth, Inc.*, 727 F.2d 1017 (11th Cir.1984). That opinion, however, held that there is no taking of property if there is compliance with 11 U.S.C. § 363(e), which allows conditioning of the use of the collateral upon the provision of adequate protection of the secured creditor's interest. The matter of adequate protection is outside the scope of the withdrawal of reference and is a matter uniquely within the expertise of the bankruptcy court.

## IV.

The applicable legal authority suggests that EWC must comply with environmental law and pursue cleanup and corrective action at the landfill, regardless of its financial insolvency. Although EWC correctly points out what may prove to be the futility of corrective action, that reality does not divorce EWC from its legal duties. Although this court has the authority to balance equities and render a judgment that is fair to all parties, the debtor has not justified the relief it seeks in this case.

Accordingly, the court now DENIES the relief requested by EWC in its motions to determine payment of groundwater monitoring expenses and to determine payment of other corrective action expenses.

SO ORDERED.